# STATE OF CONNECTICUT *v.* JIMMY STEVENSON
## (AC 20133)

Lavery, C. J., and Flynn and Daly, Js.

Argued October 25, 2001—officially released May 21, 2002

*Barbara J. O'Brien*, special public defender, for the appellant (defendant).

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Antonia Carabillo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Jimmy Stevenson, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the second degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-102, conspiracy to commit burglary in the second degree in violation of General Statutes §§ 53a-48 and 53a-102, larceny in the fifth degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-125a, conspiracy to commit larceny in the fifth degree in violation of §§ 53a-48 and 53a-125a, burglary in the third degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-103, conspiracy to commit burglary in the third degree in violation of §§ 53a-48 and 53a-103, larceny in the second degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-123, and conspiracy to commit larceny in the second degree in violation of §§ 53a-48 and 53a-123.

The defendant claims that (1) the prosecutor engaged in prosecutorial misconduct that deprived the defendant of his constitutional right to a fair trial, (2) the court improperly denied his motion to suppress his

written confession and (3) the court improperly violated his constitutional right against double jeopardy when it sentenced him under two conspiracy convictions arising from the same incident. Because we conclude that the prosecutor engaged in prosecutorial misconduct that deprived the defendant of his right to a fair trial, we reverse the judgment of the trial court and order a new trial. We also address the defendant's claim that the court improperly denied his motion to suppress his confession because the issue is likely to arise in the new trial.

The jury reasonably could have found the following facts. On the evening of October 22, 1998, Marilyn Mejia returned home from church and found that her first floor apartment at 475 Myrtle Street in New Britain had been burglarized.[1] The next afternoon, Dorotka Wilczynska returned home from shopping and found that her first floor apartment at 200 Smith Street in New Britain had been burglarized.[2] On November 11, 1998, two detectives from the New Britain police department, William Durkin and Stanley Masternak, questioned the defendant, who was under arrest and in custody on another charge, regarding the two burglaries. The defendant waived his *Miranda*[3] rights, orally confessed to the crimes, and signed a written statement indicating his complicity as a conspirator and accessory thereto. During the trial that followed, the court denied the defendant's motion to suppress his written confession. Thereafter, the jury returned a verdict of guilty on all eight charges against the defendant. This appeal followed.

---

[1] Mejia told the investigating police officer that the value of the stolen items was $400.

[2] Wilczynska estimated the value of the stolen items at more than $5000.

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

I

The defendant claims that he was denied his constitutional right to a fair trial due to prosecutorial misconduct during the cross-examination of witnesses and closing argument. He claims that the prosecutor improperly shifted the burden to the defendant to show that the police witnesses were liars, expressed her personal views as to the witnesses' credibility and referred to facts outside the record. The defendant objected to only some of the alleged improprieties at trial and now seeks review of his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), the plain error doctrine and the court's supervisory powers.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Westberry*, 68 Conn. App. 622, 635, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).

We conclude that the record is adequate for review and that the claim of prosecutorial misconduct in violation of a fundamental right is of constitutional magnitude. *State* v. *Jefferson*, 67 Conn. App. 249, 266, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). Because we also conclude that there was

constitutional error requiring a new trial, the defendant has satisfied all four prongs of *Golding* and there is no need to conduct plain error review or to invoke our supervisory powers to reverse the defendant's conviction.

The standard of review for a claim of prosecutorial misconduct is well established. "[T]o deprive a defendant of his constitutional right to a fair trial . . . the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 356–57, 696 A.2d 944 (1997).

"We have long recognized the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 302, 755 A.2d 868 (2000).

Prosecutorial misconduct may occur in the course of cross-examination of witnesses and during closing

argument. *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996); *State* v. *Daniels*, 42 Conn. App. 445, 456, 681 A.2d 337, cert. denied, 239 Conn. 928, 683 A.2d 397 (1996). "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court . . . has focused on several factors." *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include (1) the extent to which the misconduct was invited by defense conduct or argument, (2) the severity of the misconduct, (3) the frequency of the misconduct, (4) the centrality of the misconduct to the critical issues in the case, (5) the strength of the curative measures adopted and (6) the strength of the state's case. Id. We will address each of the defendant's claims of prosecutorial misconduct in turn.

## A

The defendant first claims that the prosecutor's questions and comments improperly shifted the burden to the defendant to show that the police witnesses were liars. We agree that the questions and comments were improper.

During her cross-examination of the defendant at the suppression hearing, the prosecutor asked the defendant if the two officers who testified for the state had lied about his signing the confession, and the following colloquy ensued:

"Q. So . . . you heard the police officers, I take it, testify today?

"A. Oh, yes, I have.

"Q. And your testimony is in direct conflict with what they said?

"A. Yes, it is.

"Q. So, you are saying that they came in here and lied about you, is that right?

"A. Yes, I am."

The prosecutor later argued that there was "no reason for the police officers to come in here and lie about something like that." Defense counsel argued in reply that one "reason for the police officers to lie" would be to connect someone to the town's twenty-two unsolved burglaries.

Defense counsel did not object to a similar line of questioning when the prosecutor cross-examined the defendant before the jury with respect to his waiver of his *Miranda* rights and his oral confession to the burglaries:

"Q. And, presumably, you understood your rights when [Detective] Durkin gave them to you?

"A. He didn't read me my rights, ma'am.

"Q. Okay. So, when he testified that he read you your rights and that you initialed them, that was a lie?

"A. He did not read me my rights.

"Q. So, you are saying the officer lied?

"A. Yes, I am."

A short time later, the following exchange occurred:

"Q. Did you read your rights that day?

"A. No, I did not.

"Q. Okay, so when [Detective] Durkin said he read you your rights and you initialed them, you didn't read them?

"A. No, I did not.

"Q. So, he was lying?

"A. Yes, he was.

"Q. He came in here and lied about that?

"A. Yes, he did.

"Q. Okay. And when they said they gave you food before you went out on your excursion, that was a lie, too?"

The cross-examination continued:

"Q. Okay. So you never told the police that you and Johnny Ayala burglarized those two locations?

"A. No, I did not.

"Q. Okay. They made that up or you made that up or whatever?

"A. I never told them that."

In his closing argument, defense counsel suggested that the officers had conspired to frame the defendant and that the state had based its entire case on the officers' testimony. Defense counsel argued that the officers "were under pressure. They had to find a scapegoat. . . . [T]hey had to come up with a name." He also pointed out that the prosecutor was the only person in the courtroom to describe the officers as liars and that her questions had forced the defendant to agree with this characterization: "Now, the only one in this court that brought up the word liar was the prosecutor. She's the one who pressed my client, saying, 'Okay, the officer wrote this down.' Does that mean he is a liar? And my client agreed with her.

"Our contention is that the officers either put another spin on whatever happened at that police department, and in their cruiser, and then gathered their own knowledge of what happened at each one of those houses, and that's what they were telling you the last couple of days of their whole knowledge of what happened, not necessarily by what [the defendant] had told him."

In her rebuttal, the prosecutor stated to the jurors that the defendant and the defense witnesses had "everything to gain" by lying on the witness stand: "Now, through the state's witnesses [the two police detectives], a confession was introduced into evidence and it was signed by the defendant. It was their testimony that they drove through the city of New Britain, and [the defendant] pointed out the locations. Now, the defendant says he didn't commit the crimes. He signed the document but denies reading it. Why should you believe him? The defendant has everything to gain if he lies on the [witness] stand. After all, it is he who'll be punished in this case if he is found guilty.

"Furthermore, the defendant's witnesses have everything to gain from lying on the [witness] stand. They want their grandson or their friend free from punishment. . . . Compare that to the police officers. They have nothing to gain personally if you convict the defendant. Their lives will continue on unchanged. The defendant insists that they lied on the [witness] stand, but why would they do that? They have nothing to gain." The defendant did not object.

Our resolution of this issue is guided by our Supreme Court's recent decision in *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002). In *Singh*, the prosecutor also compelled the defendant to characterize the testimony of other witnesses as untruthful and then emphasized that testimony during closing argument. Id., 704–705. The court expressly held that questions that require a defendant to comment on another witness' veracity are improper because they invade the province of the jury, create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the other witness lied, and distort the state's burden of proof. Id., 707–709. The court rejected the minority position that an exception should apply when the defendant's testimony is "the opposite of or contradicts the testimony

of other witnesses, thereby presenting a basic issue of credibility . . . [that *cannot*] be attributed to defects or mistakes in a prior witness' perception or inaccuracy of memory, rather than to lying," because there was no good reason to carve out such an exception. (Emphasis in original; internal quotation marks omitted.) Id., 710–11. "The state's objective of 'highlighting' inconsistencies in testimony may be accomplished by other, proper means. Moreover . . . testimony may be in direct conflict for reasons other than a witness' intent to deceive." Id., 711. The *Singh* court also concluded that "closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are similarly improper." Id., 712.

Here, as in *Singh*, the prosecutor improperly forced the defendant to describe the police witnesses as liars and later emphasized that testimony during closing argument. She then compounded the error by suggesting that, in contrast to the officers, it was the defendant and the defense witnesses who testified untruthfully because they had "everything to gain" from lying on the witness stand. Such comments are prohibited under *Singh* because they distort the state's burden of proof by incorrectly suggesting that, to acquit the defendant, the jury had to find that the officers lied. Accordingly, we conclude that the prosecutor's questions and comments were improper.

## B

The defendant next claims that the prosecutor improperly expressed her personal opinion as to the credibility of the witnesses. We agree.

During closing arguments, the prosecutor stated that the defendant's explanation of how he got the money to support his drug habit "was totally unbelievable." She concluded her rebuttal by arguing: "This is what this case comes down to in the final analysis, it's credibility. I

suggest to you that the policemen and the victims have no ax to grind against [the defendant]. They have much more credibility than the defendant and those who would like to see him found not guilty." The defense did not object.

"[I]t is well established that the evaluation of [witnesses'] testimony and credibility are wholly within the province of the trier of fact." (Internal quotation marks omitted.) *Hoffer* v. *Swan Lake Assn., Inc.,* 66 Conn. App. 858, 861, 786 A.2d 436 (2001). "The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper,* 258 Conn. 229, 263, 780 A.2d 53 (2001).

Nonetheless, "[b]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Hampton,* 66 Conn. App. 357, 373, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001).

In this case, the prosecutor expressed her personal opinion when she suggested to the jury that the defendant's story about where he got the money to support his drug habit was not believable and that the officers and victims, whom she said had no ax to grind against the defendant, were much more credible than the defendant and the defense witnesses. See *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 401, 726 A.2d 657 (use of pronoun "I" in argument increases chances arguments will deteriorate into expressions of personal opinion), cert. denied, 249 Conn. 920, 733 A.2d 233 (1999). These remarks were not an appropriate way to highlight the evidence presented or to suggest a reasonable conclusion that could be drawn by the jury; see *State* v. *Hampton*, supra, 66 Conn. App. 373; but, rather, constituted a form of unsworn testimony that would have been difficult for the jury to ignore because of the prosecutor's special position. We therefore conclude that the comments were improper.

## C

The defendant finally claims that the prosecutor improperly referred to facts outside the record. We agree.

At trial, the officers testified that the defendant initially was cooperative when he was questioned about the burglaries. They further testified that they had no firm suspect at that time for the Myrtle Street and Smith Street burglaries or several other unsolved burglaries. A number of witnesses, including the defendant, also testified as to his serious drug habit. In connection with this testimony, defense counsel entered records into evidence indicating that the defendant had been hospitalized voluntarily for detoxification.

In her closing argument, the prosecutor invited the jury to consider that the defendant might have cooperated and signed the written confession because he "fig-

ured he was the number one suspect anyway" and "maybe he would get a better deal in court." The defendant did not object. Thereafter, the prosecutor argued that the defendant "had to commit the crimes" to finance his drug habit: "And finally, what about his drug problem? It's still hard to believe—it's hard for me to believe that mothers of small children would want some junkie hanging around their kids. Think about it. Who are the people that commit burglaries? Often [they are] the people with drug habits, drug users. Of course, the defendant had to commit the crimes." The court overruled defense counsel's objection, observing that "[t]his is argument . . . ."

The prosecutor continued to elaborate on the drug theme: "Of course, the defendant had to commit crimes. He had his drug habit to support. If you honestly believe that someone hooked on crack cocaine can support his habit by getting money from his girlfriend [who is] a waitress at [the International House of Pancakes]. And how many friends could this defendant con to lend him money? Maybe once or twice, but for somebody who is hooked on crack cocaine? His story about money was totally unbelievable. Presumably, he needed a lot more money than his friends or family would provide. Especially, if they knew he was on drugs. Breaking into other people's houses is a lot quicker money."

The prosecutor then argued: "Now, the defendant also testified that the police never read him his rights. Anybody who has ever watched a police show on television or in the movies knows that is the first thing the police do before questioning the suspect." The court again overruled defense counsel's objection, and the prosecutor continued: "For the defendant to deny something as basic as that is absurd." Defense counsel did not object to the court's subsequent instructions that the arguments of counsel are not evidence and that the jurors had a duty to determine and weigh the evidence.

"[W]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . [T]he privilege of counsel in addressing the jury . . . must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Citation omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 336–37, 746 A.2d 761 (2000). Nonetheless, "the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . ." (Internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 811, 699 A.2d 901 (1997). Moreover, "[t]he state may . . . properly respond to inferences raised by the defendant's closing argument." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 717.

Here, the prosecutor's remarks that the defendant may have cooperated to get a better deal in court because he assumed that he was the number one suspect in the city's unsolved burglaries, and that something must have happened thereafter that caused him to change his story, cannot reasonably be inferred from the evidence. The comments also were not a proper response to inferences raised by the defendant's closing argument. To the contrary, there was no evidence presented as to what the defendant may have thought, if anything, about the unsolved burglaries. There also was no evidence presented suggesting that the defendant was the primary suspect in the unsolved burglaries or that anything happened after his initial questioning by the officers that caused him to change his story. The defense instead argued that the defendant was intoxicated at the time he signed the confession and that he thought it was a form to enroll in a drug treatment program. There also was no evidence in the record to

support the prosecutor's statements that the defendant "of course" had to commit crimes to support his drug habit, that people who commit burglaries have drug habits and that the defendant needed a lot more money to support his habit than his friends or family could provide.

The prosecutor's attempt to compare the defendant with suspects who routinely are read their *Miranda* rights in television shows and the movies also was inappropriate. "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." Id., 718. Accordingly, we conclude that the prosecutor improperly referred to evidence outside the record and invited the jurors to engage in speculation as to why the defendant signed the confession, why he was motivated to commit the burglaries and why he denied having been read his *Miranda* rights.

D

We finally consider whether the cumulative effect of the prosecutor's misconduct so infected the proceedings as to deprive the defendant of his right to a fair trial.

At various times throughout the trial, the court advised the jury as to how to view the evidence and the arguments of counsel. At the commencement of trial, the court instructed that the arguments of counsel were not to be treated as evidence. At the close of the arguments, the court instructed that the jury was the sole judge of the facts, and that "[n]o matter what I say concerning these facts or what any of the lawyers may have said, it's your recollection which is to guide you in deciding this case." The court continued, "As I have said to you several times, it's what comes out of that witness chair, under oath, that is evidence. That is the testimony or evidence . . . . You are the sole triers of the fact. . . . You the jury are responsible to determine

the facts." The court also instructed that the burden was on the state to prove the defendant guilty beyond a reasonable doubt. The court later instructed on the factors to be considered in assessing the credibility of the witnesses and advised that the credibility of the police officers was entitled to no special consideration. The defense did not take exception to the instructions.

As previously stated, our determination as to whether the prosecutor's misconduct deprived the defendant of his right to a fair trial requires us to consider the factors set forth in *Williams*, namely, the extent to which the misconduct was invited by the defense, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted and the strength of the state's case. *State* v. *Williams*, supra, 204 Conn. 540. We conclude that the defendant was denied his right to a fair trial.

Our conclusion is based, first, on the fact that the prosecutor's misconduct was not invited by the defense. The prosecutor initially pressed the defendant to characterize the officers as liars, which set in motion a chain of responses in which counsel for both sides portrayed the testimony of the opposing witnesses as untruthful. Second, the misconduct did not consist of a single, isolated episode, but recurred throughout the prosecutor's cross-examination and closing argument. Moreover, the effect of the misconduct was accentuated because the only evidence linking the defendant to the crimes charged was the signed confession and the information he provided to the officers during his interrogation. As a result, the state's case was not strong because it rested entirely on the officers' credibility.

Furthermore, by expressing her personal opinion that the officers had no ax to grind and were much more credible than the defendant and the defense witnesses,

the prosecutor improperly emphasized that the only way the defendant could be acquitted was for the jury to conclude that the officers had lied. The references to facts outside the record, in particular, the comment as to how suspects are routinely portrayed in the movies and television, also emphasized that the defendant rather than the officers had lied on the witness stand. The court's instructions to the jury were insufficient to cure this misconduct. Accordingly, we conclude that the cumulative effect of the prosecutor's misconduct deprived the defendant of his right to a fair trial.

## II

We next consider the defendant's claim that the court improperly denied his motion to suppress his written confession because this issue is likely to arise in the new trial. The defendant claims that he did not voluntarily, knowingly and intelligently waive his *Miranda* rights and did not sign the confession voluntarily. He contends that food and sleep deprivation, combined with intoxication due to drugs and alcohol, rendered him incapable of waiving his *Miranda* rights and confessing to the burglaries voluntarily. He further claims that the court improperly placed the burden of proving that the waiver and confession were involuntary on him, rather than on the state. We disagree.

At the suppression hearing, the officers testified that they brought the defendant from the lockup to the interview room at 2:30 p.m. on November 11, 1998, and asked if he would speak to them about some unsolved burglaries. The defendant agreed to do so, and Durkin read him his *Miranda* rights. After indicating that he understood his rights, the defendant read the waiver form and initialed it in four different places. Durkin then signed the form as a witness. The defendant did not sign the form on the line provided at the bottom.

The officers testified that the defendant admitted his participation, usually as a lookout, in numerous burglaries with Johnny Ayala. Both officers described the defendant as cooperative, calm, attentive and polite, saying that he responded to every question they asked and had no difficulty communicating with or understanding them. Both also testified that the defendant showed no signs of being under the influence of alcohol or drugs. While speaking with the officers, the defendant drank a can of soda and ate some candy bars that they had given him.

The defendant agreed to show the officers various locations that he and Ayala had burglarized. He was permitted to use the bathroom before they left. After the officers took the defendant to an unmarked surveillance car, the defendant said that he was hungry, so they drove to a McDonald's restaurant where the officers purchased him lunch. During the next three hours, the defendant directed the officers to twenty-four locations. At each location, the defendant described the method of entry, the items stolen and some of the individuals who purchased the stolen items. As the defendant was talking, Durkin typed the information he gave them into a laptop computer. The officers described the defendant's ability to recall the locations, including 475 Myrtle Street and 200 Smith Street, and the items taken, as "very good" and "extraordinary."

Upon their return to the police station, Durkin prepared a confession statement and read it to the defendant. After the defendant read and signed each of its three pages, Durkin signed the statement as a witness. The officers testified that they did not make any threats or promises to the defendant in exchange for his cooperation.

Later that afternoon, Durkin compared the defendant's accounts of the burglaries with existing police

records and found most of the accounts to be accurate. Further investigation revealed that the defendant's accounts of several unreported burglaries also were accurate. Durkin prepared a warrant and Masternak subsequently arrested the defendant for the Myrtle and Smith Street burglaries. At the time of his arrest, the defendant asked Masternak to tell the prosecutor and defense attorney that he had been cooperative, and Masternak did so.

The defendant's girlfriend testified that she had lived with the defendant for almost a year and that he had been at her home on the night of November 11, 1998, before his arrest. She said that the defendant was suffering badly from the effects of drugs, that his eyes were bloodshot and that he was unresponsive when she attempted to communicate with him. She testified that the defendant had been on drugs for three or four years, used drugs every day, got money for his drugs from her and from friends, and had participated voluntarily in a detoxification program at New Britain General Hospital two months before his arrest. On cross-examination, she also testified that the defendant was the father of her child and that she did not want the defendant to get into trouble.

The defendant testified that at the time of his arrest he was twenty years old and had a tenth grade education. He confirmed that he had been a drug user for three or four years and had participated voluntarily in a detoxification program. He claimed that when he was arrested he had just finished drinking and smoking, was intoxicated by drugs and alcohol and had not eaten in five days. The defendant further testified that after he was taken to the police station, the officers assured him they knew he did not have anything to do with the unsolved burglaries and that they wanted him only to implicate Ayala. The defendant claimed that the officers said that they would help him obtain treatment for his

drug habit if he cooperated. He also testified that they asked him to show them the places Ayala had burglarized and never advised him of his *Miranda* rights. He claimed that he showed the officers no more than three places Ayala said he had burglarized. He did not recall going down Myrtle or Smith Streets and he denied that he told the officers he had burglarized any houses. In addition, he testified that the officers bought him lunch at McDonald's after, rather than before, he showed them the locations.

The defendant further testified that, after returning to the police station, he slept on a table while someone typed the confession statement. He then was awakened and told to sign it. When the prosecutor showed him the signed statement, he initially denied he had ever seen it before, but then admitted his signature was at the bottom. He testified that he did not recall reading the statement and that he was tricked into signing it after the officers told him it implicated only Ayala. He also testified that he believed the statement was a form to enroll in a drug treatment program. On cross-examination, the defendant conceded that his testimony conflicted with that of the officers who had testified before him.

On rebuttal, Durkin denied that the defendant told him that he had not eaten for five days. Durkin also denied the defendant's claim that the officers took him to the McDonald's restaurant after, rather than before, he showed them the locations burglarized, and that the officers promised he would be admitted into a drug treatment program if he signed the confession.

After hearing the testimony, the court, in an oral decision, denied the defendant's motion to suppress. The court concluded, on the basis of the evidence and the totality of the circumstances, that the defendant's waiver and confession were voluntary, knowing and

intelligent. The court made no formal findings of fact. It noted, however, that the conduct of the officers was not overreaching, but comported with the requirements of *Miranda*. The court also observed that the defendant was willing to talk with the police and that he seemed alert and able to "rise to the occasion" when necessary to act on his own behalf, despite his claims of a weakened condition. The court concluded that the defendant's capacity to resist questioning by the police did not seem impaired and that he "clearly voluntarily participated in the continued dialogue with the police."

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence. . . . [W]e engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . We give great deference to the findings of the trial court because it weighs the evidence before it and assesses the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Nieves*, 65 Conn. App. 212, 216, 782 A.2d 203 (2001).

## A

We turn first to the defendant's claim that he did not waive his *Miranda* rights voluntarily, knowingly and intelligently. The defendant claims that he has no recollection that he was advised of his *Miranda* rights before he signed the confession. He claims that he was under the influence of alcohol and drugs when he was taken into custody and that he did not sign the waiver form on the signature line. We are unpersuaded.

"Pursuant to the fifth and fourteenth amendments to the United States constitution, a statement made by a defendant during custodial interrogation is admissible only upon proof that he . . . waived his rights [under *Miranda*] . . . . To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation. . . . Furthermore, [a] defendant's express written and oral waiver is strong proof that the waiver is valid." (Internal quotation marks omitted.) *State* v. *Williams*, 65 Conn. App. 59, 72–73, 782 A.2d 149, cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001).

The court's conclusion that the defendant waived his *Miranda* rights voluntarily, knowingly and intelligently, and its findings that he was alert, able to represent his own interests when necessary, had the capacity to resist questioning and voluntarily participated in a continued dialogue with the police are supported by substantial evidence. The defendant testified that he was twenty years old and had a tenth grade education. Although he pointed out that he did not sign his name on the signature line of the waiver form, he did not deny that he initialed the form in four different places. The initials alone are strong proof that the waiver was valid. See id., 76. Moreover, there is no evidence in the record that the officers employed threats, promises or coercive or deceptive measures to obtain the defendant's initials. The officers also testified that the defendant was calm, cooperative and did not appear to be under the influence of drugs or alcohol when he signed the form. Accordingly, we reject the defendant's claim.

B

We turn next to the defendant's claim that he did not sign the confession voluntarily. He claims that Durkin and Masternak induced him to sign the confession by promising to enroll him in a drug treatment program and that he thought he was signing a form to enroll in such a program. This claim also has no merit.

"[O]ur Supreme Court has . . . clarified the proper scope of appellate review of a trial court's determination of voluntariness. . . . To begin, we note the established rule that the [t]rial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . In its review of state court determinations of voluntariness, the United States Supreme Court long has concluded that the ultimate question whether, under the

totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . . [A]pplying the proper scope of review to the ultimate issue of voluntariness requires us, not to ascertain whether the trial court's finding is supported by substantial evidence, but to conduct a plenary review of the record in order to make an independent determination of voluntariness. . . . Having that clarified standard of review in mind, we now must determine whether the defendant's confession was voluntary.

"We make such a determination by examining the totality of the circumstances surrounding the confession, and determining whether the confession [was] the product of an essentially free and unconstrained choice by the maker. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Internal quotation marks omitted.) *State* v. *Smith*, 65 Conn. App. 126, 141–42, 782 A.2d 175, cert. granted on other grounds, 258 Conn. 930, 783 A.2d 1032 (2001).

We conclude, on the basis of our scrupulous examination of the record, that the defendant confessed voluntarily. The defendant was twenty years old, had a tenth grade education and the officers advised him of his *Miranda* rights before he signed the confession. See *State* v. *Lewis*, 60 Conn. App. 219, 248, 759 A.2d 518 (confession voluntary where defendant literate, twenty-

one years old and had completed three years of high school), cert. denied, 255 Conn. 906, 762 A.2d 911 (2000). The record further indicates that the defendant was not unreasonably detained for a long period of time, was given a can of soda and some candy bars at the police station, was permitted to use the rest room before the drive with the officers and was given lunch from a McDonald's restaurant sometime after he left the station. See *State* v. *Hafford*, 252 Conn. 274, 299, 746 A.2d 150 (confession voluntary where defendant unrestrained and given soda and cigarette), cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). Moreover, the officers testified that the defendant spoke clearly and did not exhibit any signs of intoxication. See *State* v. *Downey*, 45 Conn. App. 148, 163, 694 A.2d 1367, cert. denied, 242 Conn. 909, 697 A.2d 367 (1997). Even more compelling, the officers described the defendant's ability to recall the twenty-four locations and the items taken as "very good" and "extraordinary," and the defendant advised the officers of several unreported burglaries that later were confirmed. Finally, after the defendant signed the confession, he specifically requested that Masternak tell the prosecutor and the defense attorney that he had been cooperative, and Masternak did so.

To the extent that the defendant's testimony differs from that of the officers, we find no reason to discredit the officers' testimony. Furthermore, testimony by the defendant's girlfriend supporting his contention that he was intoxicated on the day he was interrogated is not credible. She claimed that she observed the defendant intoxicated at her home on the evening of November 11, 1998, but the written confession indicates that the officers interrogated the defendant and the defendant signed the confession on the *afternoon* of November 11, 1998. Accordingly, on the basis of our plenary review

of the entire record, we conclude that the defendant's confession was voluntary.

## C

We finally consider the defendant's claim that the court improperly placed the burden on him of proving that the waiver and confession were not voluntary, rather than on the state. The defendant claims that in its oral decision denying the motion to suppress, the court improperly focused on the deficiencies in the defendant's evidence instead of the persuasiveness of the state's evidence. We do not agree.

In denying the defendant's motion to suppress, the court stated that it had looked at the "totality of the circumstances" in reaching its decision. The court specifically referred to the defendant's brief, the relevant case law, the argument of the state and the testimony of the witnesses. In addition, the court expressly concluded that "the state has met its burden [of] proof . . . ."

The state has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily and that he voluntarily, knowingly and intelligently waived his *Miranda* rights. *State* v. *Williams*, supra, 65 Conn. App. 72. Here, the court's discussion of the factors it considered in reaching a decision belies the defendant's claim. Furthermore, the court specifically concluded that the state had met its burden of proof. Accordingly, we conclude that the court did not shift the burden of proving that the waiver and confession were not voluntary from the state to the defendant.

We do not consider the defendant's final claim that the court improperly sentenced him in violation of his constitutional right against double jeopardy because

we cannot say that this claim is likely to arise in the new trial.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.