STATE OF CONNECTICUT *v.* JIMMY STEVENSON
(SC 16824)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

Argued November 24, 2003—officially released June 15, 2004

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Antonia Carabillo*, former senior assistant state's attorney, for the appellant (state).

*Glenn W. Falk*, special public defender, for the appellee (defendant).

*Opinion*

BORDEN, J. The issue in this certified appeal[1] is whether certain questions posed by the assistant state's attorney to the defendant during cross-examination and

---

[1] We granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the state's cross-examination of the defendant and final argument deprived the defendant of a fair trial?" *State* v. *Stevenson*, 261 Conn. 918, 806 A.2d 1057 (2002).

certain remarks made by the assistant state's attorney in final argument deprived the defendant of a fair trial. We conclude that the defendant was not deprived of his right to a fair trial. Accordingly, we reverse the judgment of the Appellate Court to the contrary.

The state charged the defendant, Jimmy Stevenson, with burglary in the second degree as an accessory in violation of General Statutes §§ 53a-8[2] and 53a-102,[3] conspiracy to commit burglary in the second degree in violation of General Statutes §§ 53a-48[4] and 53a-102, larceny in the fifth degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-125a, conspiracy to commit larceny in the fifth degree in violation of

---

[2] General Statutes § 53a-8 provides: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.

"(b) A person who sells, delivers or provides any firearm, as defined in subdivision (19) of section 53a-3, to another person to engage in conduct which constitutes an offense knowing or under circumstances in which he should know that such other person intends to use such firearm in such conduct shall be criminally liable for such conduct and shall be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-102 provides: "(a) A person is guilty of burglary in the second degree when such person (1) enters or remains unlawfully in a dwelling at night with intent to commit a crime therein, or (2) enters or remains unlawfully in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein.

"(b) Burglary in the second degree is a class C felony."

[4] General Statutes § 53a-48 provides: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

§§ 53a-48 and 53a-125a,[5] burglary in the third degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-103,[6] conspiracy to commit burglary in the third degree in violation of §§ 53a-48 and 53a-103, larceny in the second degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-123,[7] and conspiracy to commit larceny in the second degree in violation of §§ 53a-48 and 53a-123. After a jury trial, the defendant was found guilty on all counts. The trial court rendered judgment of conviction in accordance with the jury's verdict. The defendant appealed from the judgment of conviction to the Appellate Court. That court concluded that the assistant state's attorney engaged in prosecutorial misconduct, which deprived the defendant of his

---

[5] General Statutes § 53a-125a (a) provides: "A person is guilty of larceny in the fifth degree when he commits larceny as defined in section 53a-119 and the value of the property or service exceeds two hundred fifty dollars."

[6] General Statutes § 53a-103 provides: "(a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein.

"(b) Burglary in the third degree is a class D felony."

[7] General Statutes § 53a-123 provides: "(a) A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and: (1) The property consists of a motor vehicle, the value of which exceeds five thousand dollars, (2) the value of the property or service exceeds five thousand dollars, (3) the property, regardless of its nature or value, is taken from the person of another, (4) the property is obtained by defrauding a public community, and the value of such property is two thousand dollars or less, or (5) the property, regardless of its nature or value, is obtained by embezzlement, false pretenses or false promise and the victim of such larceny is sixty years of age or older or is blind or physically disabled, as defined in section 1-1f.

"(b) For purposes of this section, 'motor vehicle' means any motor vehicle, construction equipment, agricultural tractor or farm implement or major component part of any of the above. In any prosecution under subdivision (1) of subsection (a) of this section, evidence of (1) forcible entry, (2) forcible removal of ignition, or (3) alteration, mutilation or removal of a vehicle identification number shall be prima facie evidence (A) that the person in control or possession of such motor vehicle knows or should have known that such motor vehicle is stolen, and (B) that such person possesses such motor vehicle with larcenous intent.

"(c) Larceny in the second degree is a class C felony."

right to a fair trial. *State* v. *Stevenson*, 70 Conn. App. 29, 31, 797 A.2d 1 (2002). Accordingly, the Appellate Court reversed the trial court's judgment of conviction and ordered a new trial. Id., 55. This certified appeal followed.

The jury reasonably could have found the following facts. On the night of October 22, 1998, Marilyn Mejia returned home from church to find that the back door to the first floor apartment that she shared with her husband and three children at 475 Myrtle Street in New Britain was open, and that her apartment had been burglarized. Mejia telephoned the police, and Officer Anthony Cintron arrived within one hour. Cintron investigated the apartment for signs of forced entry, and finding none, inventoried the missing property. After Cintron left, Mejia and her husband discovered that additional property was missing, and that a glass window had two holes sliced into it. Neither Mejia nor her husband, however, notified the police of the additional missing property or alerted the police to the holes that had been sliced into the window.

The following afternoon, on October 23, 1998, Dorotka Wilczynska returned home from shopping to find that the rear door to the first floor apartment that she shared with her husband and her brother at 200 Smith Street in New Britain was open. Wilczynska also saw that the lock was broken and that her apartment had been burglarized. Wilczynska telephoned the police, and Officer Philip Caseria arrived to investigate. Caseria noted damage consistent with a forced entry and inventoried the property that Wilczynska identified to him as missing. After Caseria left, Wilczynska and her husband discovered additional missing property and contacted the police to add it to the inventory. After the defendant became a suspect in the burglaries, neither Mejia nor Wilczynska recognized the defendant's name or

acknowledged lending him keys or otherwise giving him access to their apartments.

On November 11, 1998, two detectives from the New Britain police department, William Durkin and Stanley Masternak, questioned the defendant, who was under arrest and in custody on another charge, regarding the burglaries at Mejia's and Wilczynska's apartments. The defendant waived his *Miranda*[8] rights, and told the detectives that he and another individual had committed a number of burglaries in the Broad Street area of New Britain. The defendant then accompanied the detectives on a drive through the Broad Street neighborhood in an unmarked police vehicle, pointing out numerous homes and businesses that he and his accomplice had burglarized. Among these locations were the first floor apartments at 475 Myrtle Street and 200 Smith Street. Regarding the burglary at 475 Myrtle Street, the defendant told Durkin and Masternak that he and his accomplice had entered through a side window. The defendant also told the detectives that he and his accomplice had stolen several property items from 475 Myrtle Street, which the detectives later discovered were not included in Cintron's inventory.

After the defendant pointed out the burglary locations, the defendant and the detectives returned to the police department where Durkin prepared a written statement, which the defendant read and then signed. The defendant was later arrested on the basis of that statement. Thereafter, the defendant moved to suppress his confession, and the trial court denied his motion. He was tried to a jury, and the state introduced his confession into evidence. The defendant denied that he had confessed to the detectives that he had committed burglary, and testified that he supported his significant

---

[8] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

drug habit by borrowing money from his friends, including his girlfriend, who was a waitress at a fast-food diner. The defendant further testified that he had been intoxicated and sleep deprived when he was questioned by the detectives, that the detectives had not read him his rights, and that they had tricked him into signing a fraudulent confession. The jury returned a verdict of guilty on all counts charged.

The defendant appealed from the judgment of conviction to the Appellate Court, claiming, among other things, that the assistant state's attorney engaged in prosecutorial misconduct, thus depriving him of his right to a fair trial. The Appellate Court agreed with the defendant, reversed the judgment of conviction, and ordered a new trial. *State* v. *Stevenson*, supra, 70 Conn. App. 55.[9] Specifically, the Appellate Court concluded that certain cross-examination questions posed by the assistant state's attorney to the defendant during trial, as well as during the assistant state's attorney's voir dire of the defendant and the defendant's hearing on his motion to suppress, compelled the defendant to characterize opposing witnesses as liars in violation of this court's holding in *State* v. *Singh*, 259 Conn. 693, 700, 793 A.2d 226 (2002). *State* v. *Stevenson*, supra, 34. The Appellate Court further concluded that the assistant state's attorney, during final argument, improperly expressed her personal opinion as to the credibility of witnesses and referred to facts outside the record. Id., 38–43. After performing a due process analysis, the Appellate Court concluded that the cumulative effect of the assistant state's attorney's conduct so infected the proceedings as to deprive the defendant of his right to a fair trial. Id., 44.

[9] Accordingly, the Appellate Court did not address the defendant's other claim, namely, that the trial court improperly sentenced him in violation of his constitutional right against double jeopardy. *State* v. *Stevenson*, supra, 70 Conn. App. 54–55. Thus, that claim remains for consideration by the Appellate Court upon our remand.

On appeal to this court, the state claims that the Appellate Court improperly concluded that some of the assistant state's attorney's cross-examination questions and remarks made during final argument constituted misconduct, and that, in determining whether the conduct deprived the defendant of a fair trial, the Appellate Court incorrectly applied the factors for assessing harm. Specifically, the state claims that the Appellate Court: (1) failed to consider the effect of the defendant's defense; (2) improperly considered certain cross-examination questions asked outside the presence of the jury in assessing the severity and frequency of the misconduct; (3) failed to consider the ameliorative effects of the trial court's instructions to the jury; and (4) failed to consider the strength of the state's case against the defendant. We agree with the state's claims.

Before addressing the certified question before us, namely, whether the Appellate Court improperly concluded that the assistant state's attorney's conduct deprived the defendant of a fair trial, "we first review the principles that govern our resolution of claims of prosecutorial misconduct. [T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 245–46, 833 A.2d 363 (2003).

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecu-

tor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 376–77, 832 A.2d 14 (2003).

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003).

Due to continued confusion, we also take this opportunity to clarify our due process analysis in cases involving incidents of prosecutorial misconduct that were not objected to at trial. In doing so, we conclude that, in cases like the present one, it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567

A.2d 823 (1989),[10] and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As we stated in that case: "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id.

Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the con-

---

[10] Under *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.)

stitutional violation exists, and whether it was harmful. *State* v. *Golding*, supra, 213 Conn. 240. Requiring the application of both *Williams* and *Golding*, therefore, would lead, as in fact has occurred in the present case, to confusion and duplication of effort. Furthermore, the application of the *Golding* test to unchallenged incidents of misconduct tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves. Application of the *Williams* factors provides for such an analysis, and the specific *Golding* test, therefore, is superfluous.[11] In light

[11] In this regard, we assume, of course, that the defendant's claimed prosecutorial misconduct is in fact presented by an adequate record—essentially the first *Golding* requirement. We note also that a claim of prosecutorial misconduct will, by its very nature, be of truly constitutional magnitude—essentially the second *Golding* requirement. Finally, the determination that a defendant has or has not been deprived of a fair trial so as to warrant reversal under *State* v. *Williams*, supra, 204 Conn. 540, is essentially a conclusion under the third and fourth *Golding* requirements. This discussion highlights why specific application of the *Golding* requirements is simply superfluous when a claim of prosecutorial misconduct is presented.

We also note that we have, in the context of adjudicating claims of prosecutorial misconduct presented under *Golding*, applied heightened standards for reversal. See, e.g., *State* v. *Thompson*, 266 Conn. 440, 480–81, 832 A.2d 626 (2003); ("[g]iven the defendant's failure to object, only instances of grossly egregious misconduct will be severe enough to mandate reversal"); *State* v. *Somerville*, 214 Conn. 378, 393, 572 A.2d 944 (1990) ("[W]e have long held that [*Golding*] review of [unpreserved claims of prosecutorial misconduct] is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial. . . . Although certain remarks made by the prosecutor, from hindsight, may be deemed imprudent, such isolated and brief episodes . . . fail to implicate the denial of the defendant's constitutional right to due process." [Citations omitted.]); see also *State* v. *Atkinson*, 235 Conn. 748, 769, 670 A.2d 276 (1996) (same). To the extent that these cases stand for heightened standards, we confine them to their facts because we now specifically disconnect the *Golding*

of these observations, we conclude that, following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial.

This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of "whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. *State* v. *Negron*, [221 Conn. 315, 330, 603 A.2d 1138 (1992)]; see also *State* v. *Andrews*, 248 Conn. 1, 19–20, 726 A.2d 104 (1999) (failure of defense counsel to object to prosecutor's rebuttal argument suggested that 'defense counsel did not believe that it was unfair in light of the record of the case at the time'); *State* v. *Robinson*, [227 Conn. 711, 745–46, 631 A.2d 288 (1993)] (failure to object to closing arguments indicated that defense counsel 'did not regard . . . remarks as seriously prejudicial at the time they were made'). Moreover, ordinarily, when a defendant who raises an objection to the allegedly improper remarks of a prosecutor elects to pursue one remedy at trial instead of another, he will not be permitted to claim on appeal that the remedy he pursued was insufficient. Cf. *State* v. *Drakeford*, 202 Conn. 75, 81,

rubric from the due process analysis applicable to claims of prosecutorial misconduct. This is because: (1) a claim of prosecutorial misconduct, by definition, presents an issue of constitutional magnitude; (2) such heightened standards do not fit well in cases, such as the present case, where some claims were and some claims were not presented at trial, which will often be the case; and (3) the ultimate question will always be whether the misconduct deprived the defendant of a fair trial.

519 A.2d 1194 (1987)." *State* v. *Reynolds*, 264 Conn. 1, 165, 836 A.2d 224 (2003). In other words, the fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted.

"We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. *State* v. *Andrews*, [supra, 248 Conn. 19–20]. Moreover as the Appellate Court has observed, defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument. . . . *State* v. *Dillard*, 66 Conn. App. 238, 249, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001). Accordingly, we emphasize that counsel's failure to object at trial, while not by itself *fatal* to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial misconduct claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 414–15.

We begin our analysis in the present case, therefore, by first determining whether the assistant state's attor-

ney's conduct constituted prosecutorial misconduct. The Appellate Court concluded that the assistant state's attorney engaged in misconduct during both cross-examination and final argument. Specifically, the Appellate Court concluded that the assistant state's attorney's questions during cross-examination of the defendant violated this court's holding in *State* v. *Singh*, supra, 259 Conn. 700, and that remarks during her final argument improperly expressed her personal opinion as to the credibility of witnesses and referred to facts outside the record. *State* v. *Stevenson*, supra, 70 Conn. App. 40, 43. We, therefore, separate our analysis of the challenged conduct into separate parts, based on: (1) whether the conduct occurred during cross-examination or during closing argument; and (2) the nature of the claimed impropriety. We then proceed to the due process analysis in part III of this opinion.

I

## CROSS-EXAMINATION QUESTIONS

The state claims that the Appellate Court improperly considered questions that the assistant state's attorney had asked outside the presence of the jury in assessing whether her cross-examination of the defendant was improper.[12] We agree with the state. The following additional facts are necessary for the resolution of this issue.

On three separate occasions during cross-examination, the assistant state's attorney asked questions of the defendant requiring him to say, explicitly, that the detectives had lied when they testified before the jury that the defendant knowingly had waived his *Miranda*

[12] The parties both acknowledge that the Appellate Court erred in stating in its opinion that one of the two colloquies that occurred outside the jury's presence had occurred before the jury. See *State* v. *Stevenson*, supra, 70 Conn. App. 35.

rights and had confessed to the burglaries.[13] The defen-

[13] The first such incident occurred outside the jury's presence, during the assistant state's attorney's cross-examination of the defendant during the hearing on the defendant's motion to suppress:

"[Assistant State's Attorney]: Do you know how to read?

"[Defendant]: Yes.

"[Assistant State's Attorney]: Okay. So your testimony is that—you heard the police officers, I take it, testify today?

"[Defendant]: Oh, yes, I have.

"[Assistant State's Attorney]: And your testimony is in direct conflict with what they said?

"[Defendant]: Yes, it is.

"[Assistant State's Attorney]: So you are saying that they came in here and lied about you, is that right?

"[Defendant]: Yes, I am.

"[Assistant State's Attorney]: You were never given your rights?

"[Defendant]: No, I wasn't.

"[Assistant State's Attorney]: And you pointed out three places, that's all?

"[Defendant]: That's all.

"[Assistant State's Attorney]: And you don't know anything about the Smith Street incident, is that right?

"[Defendant]: That's right. . . .

"[Assistant State's Attorney]: So they tricked you into signing that statement?

"[Defendant]: Yes.

"[Assistant State's Attorney]: You just signed it because—

"[Defendant]: I thought I was getting a program for my drug problem.

"[Assistant State's Attorney]: So you didn't read it?

"[Defendant]: No, I didn't.

"[Assistant State's Attorney]: You know how to read it, but you didn't read it?

"[Defendant]: No, I didn't. I took their word for granted, which I shouldn't have.

"[Assistant State's Attorney]: It was your testimony that you showed the police three locations that [your accomplice] told you he had burglarized?

"[Defendant]: Yes.

"[Assistant State's Attorney]: And at no point did you indicate that you were involved?

"[Defendant]: Exactly.

"[Assistant State's Attorney]: So, they lied about that, too?

"[Defendant]: Yes they did, ma'am."

The second incident also occurred outside the jury's presence, during the assistant state's attorney's voir dire of the defendant:

"[Assistant State's Attorney]: Didn't you say before that you never committed any burglaries?

"[Defendant]: Yes, I did.

dant did not object on any of these three occasions. Only one of these colloquies, however, occurred in the jury's presence, and the state conceded before this court at oral argument that the assistant state's attorney's questions before the jury on this occasion were

"[Assistant State's Attorney]: And you can read and write, is that correct, sir?

"[Defendant]: Yes, I can.

"[Assistant State's Attorney]: And, presumably, you understood your rights when Officer Durkin gave them to you?

"[Defendant]: He didn't read me my rights, ma'am.

"[Assistant State's Attorney]: Okay. So when he testified that he read you your rights and that you initialed them, that was a lie?

"[Defendant]: He did not read me my rights.

"[Assistant State's Attorney]: So you are saying the officer lied?

"[Defendant]: Yes, I am."

The third incident occurred in the jury's presence, during the assistant state's attorney's cross-examination of the defendant:

"[Assistant State's Attorney]: Okay. Isn't it true you were in custody of the New Britain police department on November 11, 1998, for a burglary?

"[Defendant]: Yes.

"[Assistant State's Attorney]: So you were under arrest for a burglary, is that true?

"[Defendant]: Yes.

"[Assistant State's Attorney]: Okay. Now you indicated that you can read and write, is that true?

"[Defendant]: Yes.

"[Assistant State's Attorney]: Did you read your rights that day?

"[Defendant]: No, I did not.

"[Assistant State's Attorney]: Okay. So when Officer Durkin said he read you your rights and you initialed them, you didn't read them?

"[Defendant]: No, I did not.

"[Assistant State's Attorney]: So he was lying?

"[Defendant]: Yes, he was.

"[Assistant State's Attorney]: He came in here and lied about that?

"[Defendant]: Yes, he did.

"[Assistant State's Attorney]: Okay. And when they said they gave you food before you went out on your excursion, that was a lie, too?

"[Defendant]: They gave me candy bars and soda before we left. The part about us going to McDonald's before they showed me where to go was a lie. They took me after. . . .

"[Assistant State's Attorney]: Okay. So you never told the police that you and [your accomplice] burglarized those two locations?

"[Defendant]: No, I did not.

"[Assistant State's Attorney]: Okay. They made that up or you made that up or whatever?

"[Defendant]: I never told them that."

improper. It is not necessary, therefore, for us to determine whether these particular questions were, in fact, improper. We conclude, however, that the questions asked *outside* the jury's presence during a hearing on the defendant's motion to suppress and during the assistant state's attorney's voir dire of the defendant were not improper.

As we previously have recognized, "[p]rosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 700. In *Singh*, we stated that it is a "well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity." Id., 706. "Several reasons underlie the prohibition on such questions. First, it is well established that determinations of credibility are for the jury, and not for witnesses. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." (Citations omitted; internal quotation marks omitted.) Id., 707–708. "Second, questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . such as misrecollection, failure of recollection or other innocent rea-

son." (Citations omitted; internal quotation marks omitted.) Id., 708. Any suggestion that a jury can acquit only if it finds that a witness lied is improper because such a suggestion "involves a distortion of the government's burden of proof." (Internal quotation marks omitted.) Id., 709.

The Appellate Court concluded that the assistant state's attorney's cross-examination questions during her voir dire of the defendant and during the defendant's hearing on his motion to suppress and her subsequent reference to his answers during final argument were improper under our holding in *State* v. *Singh*, supra, 259 Conn. 707, because the assistant state's attorney, through her questioning, compelled the defendant to characterize the detectives as liars, thereby shifting the state's burden of proof by suggesting, in essence, that in order to acquit the defendant, the jury would have to find that the detectives lied. *State* v. *Stevenson*, supra, 70 Conn. App. 37–38. The state claims, in response, that the jury's perception of the state's burden of proof could not have been affected because the jury was not present to hear the questions or the defendant's answers. We agree with the state. The potential harmfulness of cross-examination questions that require the defendant to characterize opposing witnesses as liars arises solely from the potential effect that those questions may have on the jury. If the jury is not present to hear them, there is no potential for harm and, therefore, the questions did not provide a basis for the defendant's claim that he was denied a fair trial due to prosecutorial misconduct.

## II

### CLOSING ARGUMENTS

The state next claims that the Appellate Court improperly concluded that seven remarks made by the assistant state's attorney during closing argument were improper because they expressed her personal opinion

as to the credibility of witnesses and referred to facts outside the record. We agree with the state. The state conceded that one of these remarks, namely, a reference to depictions of police in movies and on television was improper.[14] It is not necessary, therefore, for us to determine whether, in fact, it was improper. We examine the remaining six remarks, however, to determine whether they were improper, and we conclude that they were not.

## A

### Remarks Pertaining to the Witnesses' Credibility

The Appellate Court concluded that the assistant state's attorney, on three separate occasions during final argument, improperly expressed her personal opinion as to the credibility of witnesses. Id., 38–39. In the first instance, during closing argument, the assistant state's attorney characterized the defendant's explanation of how he obtained money to support his drug habit as "totally unbelievable." In the second instance, during her rebuttal argument, the assistant state's attorney stated that the case against the defendant was based entirely on the credibility of the various testifying witnesses, and that the defendant's witnesses had "everything to gain from lying on the stand." Finally, the assistant state's attorney argued to the jury, "I suggest to you that the policemen and the victims have no ax

---

[14] The following colloquy occurred during the assistant state's attorney's remarks on rebuttal during her final argument to the jury:

"[Assistant State's Attorney]: Now the defendant also testified that the police never read him his rights. Anybody who has ever watched a police show on television or in the movies, knows that is the first thing the police do before questioning the suspect.

"[Defense Counsel]: Objection, Your Honor.

"The Court: Overruled. This is argument . . . .

"[Defense Counsel]: I have a right—

"The Court: Certainly you do.

"[Assistant State's Attorney]: For the defendant to deny something as basic as that is absurd."

to grind against [the defendant]. They have much more credibility than the defendant and those who would like to see him found not guilty." The defendant did not object to any of these remarks.

We have held that "prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 700. Before determining whether the assistant state's attorney's remarks during final argument rise to the level of misconduct, we first set forth the principles that govern the determination of this issue. "[A] prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 462, 832 A.2d 626 (2003). However, "[i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney

should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Citations omitted; internal quotation marks omitted.) Id., 465–66.

The assistant state's attorney's remark during closing argument describing the defendant's explanation as to how he obtained money to buy drugs as "totally unbelievable" did not necessarily express her personal opinion. Rather, it was a comment on the evidence presented at trial, and it posited a reasonable inference that the jury itself could have drawn without access to the assistant state's attorney's personal knowledge of the case. The jury heard the defendant, his grandmother, his girlfriend and her brother all testify that the defendant had a serious drug habit. The jury also heard evidence that the defendant had been only sporadically employed during the months preceding the burglaries, and that he quickly spent his occasional paychecks without having any purchases to show for it. The defendant and his girlfriend also testified that the girlfriend worked as a waitress in a fast-food diner, and that she sometimes gave the defendant money to buy drugs when he begged her for it. On the basis of this evidence, the jury reasonably could have inferred that the defendant was untruthful when he testified that he obtained all of the money with which he bought drugs by borrowing from his friends, and the assistant state's attorney's remark that his story was "totally unbelievable" represented a reasonable inference that did not suggest the existence of secret knowledge.

Similarly, the assistant state's attorney's remark on rebuttal, suggesting that the police and the victims had no reason to lie, while the defendant and his friends and family did, was also not based on personal opinion,

but on the ascertainable motives of the witnesses.[15] We have held that "[i]t is not improper for a prosecutor to remark on the motives that a witness may have to lie," or not to lie, as the case may be. *State* v. *Thompson,* supra, 266 Conn. 466. The remarks by the assistant state's attorney in the present case fell into this category. We disagree with the Appellate Court's determination that the assistant state's attorney's "remarks were not an appropriate way to highlight the evidence presented or to suggest a reasonable conclusion that could be drawn by the jury . . . ." (Citation omitted.) *State* v. *Stevenson,* supra, 70 Conn. App. 40. Nor did her remarks constitute a form of unsworn testimony that would have been difficult for the jury to ignore because of her special position as an assistant state's attorney. Id. Instead, her remarks underscored an inference that the jury could have drawn entirely on its own, based on the evidence presented. In fact, the assistant state's attorney's use of the phrase "I suggest to you" achieved the same effect as stating "I submit to you." The assistant state's attorney was not saying that she vouched for her witnesses' truthfulness and the defendant's witnesses' lack of truthfulness; rather, she was urging the jury to find that they were truthful or untruthful for the reasons stated. Her remarks drew on facts in evidence

---

[15] The following excerpt from the assistant state's attorney's rebuttal argument contains the remarks found to be improper by the Appellate Court. "Now through the state's witnesses, Durkin and Masternak, a confession was introduced into evidence and it was signed by the defendant. It was their testimony, that they drove through the city of New Britain and [the defendant] pointed out the locations. Now the defendant says he didn't commit the crimes. He signed the document but denies reading it. Why should you believe him? The defendant has everything to gain if he lies on the stand. After all, it is he [who will] be punished in this case if he is found guilty.

"Furthermore, the defendant's witnesses have everything to gain from lying on the stand. They want their grandson or their friend free from punishment. They all have something personal in this case. Compare that to the police officers. They have nothing to gain personally if you convict the defendant. Their lives will continue on unchanged."

and did not rely on her special position as an assistant state's attorney and, therefore, were not improper.

B

Remarks Referring to Facts Outside the Record

The state further claims that the Appellate Court improperly concluded that the assistant state's attorney twice referred to facts outside the record in explaining in final argument why the defendant may have cooperated with police and why he may have felt he had to commit burglary to support his drug habit. *State* v. *Stevenson*, supra, 70 Conn. App. 40. We agree with the state.

In the first instance, the assistant state's attorney asked the jury to consider whether the defendant may have cooperated and signed the written confession because "[h]e figured he was the number one suspect anyway . . . and maybe he would get a better deal in court." In the second instance, the state's attorney argued that the defendant "had to commit [the] crimes" to finance his drug habit.[16] The defendant objected to the second remark and was overruled by the court.

---

[16] The assistant state's attorney's remarks during final argument were as follows:

"[Assistant State's Attorney]: And finally, what about his drug problem? . . . Think about it. Who are the people that commit burglaries? Often [they are] the people with drug habits, drug users. Of course, the defendant had to commit crimes.

"[Defendant]: Objection, Your Honor.

"The Court: I will overrule that objection.

"[Assistant State's Attorney]: Of course, the defendant had to commit crimes. He had his drug habit to support. If you honestly believe that someone hooked on crack cocaine can support his habit by getting money from his girlfriend [who is] a waitress at [the International House of Pancakes]. And how many friends could this defendant con to lend him money? Maybe once or twice, but for someone who is hooked on crack cocaine? . . . Presumably, he needed a lot more money than his friends or family would provide. Breaking into other peoples' houses is a lot quicker money."

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . The rationale for the rule prohibiting the state from making such a reference is to avoid giving the jury the impression that the state has private information, not introduced into evidence, bearing on the case." (Citations omitted; internal quotation marks omitted.) *State* v. *Fields*, 265 Conn. 184, 208, 827 A.2d 690 (2003). "[T]he privilege of counsel in addressing the jury . . . must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 337, 746 A.2d 761 (2000).

In the present case, the assistant state's attorney's argument that the defendant cooperated with the police regarding the two burglaries at 475 Myrtle Street and 200 Smith Street only because he may have thought he was already a suspect and by his cooperation "maybe he would get a better deal in court," was not mere speculation. The jury heard evidence that the defendant was in custody at the time that he was questioned by Detectives Durkin and Masternak after being arrested for burglary. The jury also heard from both detectives that the defendant was "very cooperative" and "very polite," and that he wanted the detectives to be sure to tell the prosecutor that he had been cooperative. Moreover, the defendant, himself, testified that he had cooperated with the detectives because he believed that they could help him gain admittance to a drug treatment program. From this evidence the jury reasonably could have inferred that the defendant may have thought that he might be a burglary suspect, and that cooperating with the police was in his best interest. The assistant state's attorney's argument laying out this inference was

based on evidence in the record, and did not amount to mere speculation and baseless conjecture. Thus, we conclude that her remarks were not improper.

Furthermore, the assistant state's attorney's argument that the defendant may have resorted to burglary to finance his drug habit was supported by evidence in the record. As we previously have noted in part II A of this opinion, the defendant, his grandmother, his girlfriend and her brother all testified that the defendant had a serious drug habit. Moreover, the defendant introduced into evidence the medical records from a drug rehabilitation program in which he had enrolled for one week in September, 1998. In those records was a note from the program staff, indicating that the defendant had reported "lying and stealing" as problems associated with his drug use. The jury also heard evidence that the defendant had been only sporadically employed during the months preceding the burglaries, and that he had quickly spent his occasional paychecks without having any purchases to show for it. The defendant and his girlfriend also testified that she sometimes gave him money to buy drugs and that he had begged her for money. Finally, the defendant testified that his accomplice told him at their first meeting that burglary was a better way to get money for drugs than asking people for it. This evidence supports the reasonable inference, argued by the assistant state's attorney in final argument, that the defendant may have turned to burglary and larceny to finance his drug habit. We conclude, therefore, that her argument did not improperly rely on facts not in evidence.[17]

---

[17] By the same token, we disagree with the defendant's claim made at oral argument before this court that the inference argued for by the assistant state's attorney had to have a basis in the "economics" of drugs in order to be considered proper. The jury did not need to hear evidence on the price of crack and heroin or a waitress' average wages to decide that a person with a sizable daily drug habit may have difficulty financing that habit solely through the generosity of friends. "In deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own

In sum, we conclude that, other than the concededly improper conduct, namely, the assistant state's attorney's questions asked in the jury's presence during cross-examination of the defendant that required him to characterize the detectives as liars, and her reference during final argument to depictions of police on television, none of the assistant state's attorney's cross-examination questions asked outside the jury's presence and none of her remarks made in closing arguments was improper.

## III

## DUE PROCESS ANALYSIS

We now turn to the question of whether the conceded improprieties "so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 723. We agree with the state's claim that the assistant state's attorney's misconduct did not so infect the trial with unfairness as to make the conviction a denial of due process, and, thus, deprive the defendant of his right to a fair trial.

The first conceded impropriety was the assistant state's attorney's questions during cross-examination of the defendant requiring him to characterize the testimony of Detectives Durkin and Masternak as lies.[18] Dur-

observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 402.

[18] The following colloquy occurred during the assistant state's attorney's cross-examination of the defendant:

"[Assistant State's Attorney]: Okay. Isn't it true you were in custody of the New Britain police department on November 11, 1998, for a burglary?

"[Defendant]: Yes.

"[Assistant State's Attorney]: So you were under arrest for a burglary, is that true?

"[Defendant]: Yes.

"[Assistant State's Attorney]: Okay. Now, you indicated that you can read and write, is that true?

ing final argument, the assistant state's attorney referred to this colloquy as follows: "[Detectives Durkin and Masternak] have nothing to gain personally if you convict the defendant. Their lives will continue on unchanged. The defendant insists that they lied on the stand, but why would they do that?" The defendant did not object either to the cross-examination questions or to the assistant state's attorney's reference to them in rebuttal during final argument.

The second conceded impropriety involved the assistant state's attorney's argument on rebuttal that the jury should not believe the defendant's claim that the detectives had not read him his *Miranda* rights before questioning him. Specifically, the assistant state's attorney told the jury that "[a]nybody who has ever watched a police show on television or in the movies, knows that [reading a suspect his *Miranda* rights] is the first thing the police do before questioning the suspect. . . . For the defendant to deny something as basic as that

"[Defendant]: Yes.

"[Assistant State's Attorney]: Did you read your rights that day?

"[Defendant]: No, I did not.

"[Assistant State's Attorney]: Okay. So when Officer Durkin said he read you your rights and you initialed them, you didn't read them?

"[Defendant]: No, I did not.

"[Assistant State's Attorney]: So he was lying?

"[Defendant]: Yes, he was.

"[Assistant State's Attorney]: He came in here and lied about that?

"[Defendant]: Yes, he did.

"[Assistant State's Attorney]: Okay. And when they said they gave you food before you went out on your excursion, that was a lie, too?

"[Defendant]: They gave me candy bars and soda before we left. The part about us going to McDonald's before they showed me where to go was a lie. They took me after. . . .

"[Assistant State's Attorney]: Okay. So you never told the police that you and [your accomplice] burglarized those two locations?

"[Defendant]: No, I did not.

"[Assistant State's Attorney]: Okay. They made that up or you made that up or whatever?

"[Defendant]: I never told them that."

is absurd." The defendant objected to the remarks, but he was overruled by the trial court, which responded with the comment that "[t]his is argument . . . ."

As we have already stated previously in this opinion, the touchstone of our due process analysis is the fairness of the entire trial. We begin, therefore, by applying the *Williams* factors. *State* v. *Williams*, supra, 204 Conn. 540. In applying the *Williams* factors, however, we remain cognizant of the fact that the defendant objected to only one of the incidents of misconduct, and this fact must enter into our assessment of each factor. As we have already stated, any determination as to whether reversal is warranted must take into account the fact that the defendant did not object to the conduct at the time.

## A

### Whether the Misconduct Was Invited

The state first claims that the Appellate Court improperly determined that the assistant state's attorney's questions and remarks were uninvited by the defense. Specifically, the state claims that the defendant's entire defense rested on the notion that Detectives Durkin and Masternak lied about the circumstances surrounding his confession, and that the Appellate Court failed to consider the invitation that this defense theory provided to the assistant state's attorney. We agree with the state.

The following additional facts are necessary for the resolution of this issue. The defendant testified at trial that the detectives took advantage of him while he was clearly intoxicated, hungry and sleep deprived. The detectives, however, testified that the defendant had shown no sign of being intoxicated or otherwise impaired. The defendant further testified that the detectives had asked him to make a statement regarding his

accomplice's activities and had promised him that, in exchange for his cooperation, they would help the defendant gain admittance to a drug rehabilitation program. Durkin and Masternak, however, testified that they specifically had questioned the defendant regarding his own activities relative to the burglaries in the Broad Street neighborhood. Furthermore, the detectives denied that they had told the defendant that they would help him get into a drug rehabilitation program, because such a promise was beyond their ability to make or keep. The defendant also claimed that the detectives did not read him his rights before questioning him, and that he had pointed out only three locations that his accomplice had burglarized despite the fact that he remembered spending "hours" in the car with the detectives. This testimony directly contradicted the testimony of the detectives, who testified that they read the defendant his *Miranda* rights and that he had shown them numerous homes and businesses that he had said he and his accomplice had burglarized. The defendant further claimed that the detectives had bought him a meal from McDonald's restaurant only after he had shown them the locations, and that he had later fallen asleep on a desk back at the police station. The detectives testified that they bought the defendant a meal at McDonald's before they drove the defendant through the neighborhood and that he had not fallen asleep on a desk back at the police station. Finally, the defendant testified that he had been awakened by the detectives and was asked to sign something. The defendant testified that when he had asked what he was signing, the detectives told him that he was signing papers for admittance into a drug treatment program. Durkin and Masternak, on the other hand, testified that the defendant read the statement that they had prepared and signed it voluntarily, and that there had been no mention of a drug rehabilitation program.

The defense, during final argument, then proceeded to underscore this theory of the case by insisting that the underlying issue was one of credibility. The defendant's counsel argued to the jury as follows: "Now, the only one in this court that brought up the word liar was the prosecutor. She's the one who pressed my client saying, 'Okay, the officer wrote this down. Does that mean he is a liar?' And my client agreed with her. Our contention is that the officers either put another spin on whatever happened at that police department, and in their cruiser, and then gathered their own knowledge of what happened at each one of those houses, and that's what they were telling you the last couple days of their whole knowledge of what happened." Although the defense bridled at the assistant state's attorney's attempt to force the defendant to tell the jury that he was necessarily calling the detectives liars, it was nevertheless the defense's theory that the detectives "put a spin" on things or were otherwise not entirely truthful. A rose by any other name, however, is still a rose. The defense may decry the assistant state's attorney's questionable tactics, but the fact remains that the defense's entire theory of the defendant's innocence was predicated on the assumption that the police had lied. We, therefore, agree with the state that the defense invited the assistant state's attorney's improper questions.

## B

### The Frequency and Severity of the Misconduct

We next consider the state's claim that the Appellate Court improperly determined that the assistant state's attorney's misconduct was both frequent and severe. We agree with the state. In parts I and II of this opinion, we determined that only two of the seven instances of challenged conduct that were cited by the Appellate Court as improper were, in fact, improper. We are, therefore, left with only two instances of misconduct—

one of which occurred during cross-examination and was reiterated during final argument, and one that occurred only during final argument. We cannot conclude, therefore, that the misconduct was frequent.

We also agree with the state that the misconduct was not severe. As regards the assistant state's attorney's cross-examination questions that led the defendant to characterize the detectives as liars, we held in *State* v. *Singh*, supra, 259 Conn. 710–11, that questions and argument that compel the jury to believe that the only way that it can acquit the defendant is to find that opposing witnesses lied are improper, but that their harm may be ameliorated by the defense's own claim, be it implicit or explicit, that the opposing witnesses lied. In *Singh*, we noted that the defense did not rely on claims that witnesses were lying or otherwise deliberately misrepresenting the facts, and that, therefore, the prosecutor's attempt to pigeonhole the defendant into stating this as his main defense was both improper and harmful. Id., 711 n.15. In the present case, however, the defendant himself, by virtue of his defense, claimed that the witnesses against him were lying. Thus, the assistant state's attorney's attempt to characterize his defense in this manner was invited and, therefore, not harmful under our holding in *Singh*. This lack of harmfulness combined with the defendant's failure to object lead us to conclude that any misconduct involving the assistant state's attorney's questions during cross-examination and remarks during final argument was not severe.

Furthermore, we note that the defendant failed to object to the assistant state's attorney's questions. The defendant again failed to object when she referred to the defendant's characterization of Detectives Durkin and Masternak during final argument. The defendant also failed to request curative instructions or move for a mistrial. "[C]ounsel's failure to object at trial, while

not by itself *fatal* to [the] defendant's claim, frequently will indicate on appellate review that the challenged [questions did] not" deprive the defendant of his right to a fair trial. (Emphasis in original; internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 414.

Similarly, we cannot conclude that the assistant state's attorney's misconduct in referring to television police shows was severe. We agree with the defendant that her remark, namely, that it was "absurd" for the defendant to claim that Detectives Durkin and Masternak never read him his rights because television shows regularly depict such warnings being given, was improper, because it suggested, without any factual basis, that, therefore, the police officers in the present case must also have done so. The remark was, nevertheless, not severe because it is unlikely that the jury would rely on it to confuse what happens on television with what occurred in the present case.

C

The Strength of the State's Case

We next consider the state's claim that the Appellate Court improperly evaluated the state's case as weak because the circumstances surrounding the defendant's confession were contested. Furthermore, the state claims that the Appellate Court's determination that the state's case rested entirely on issues of credibility ignored the independent physical evidence substantiating the state's allegations, namely, the defendant's indication to the detectives that he and his accomplice had gained entry into the apartment at 475 Myrtle Street by slicing the glass in a side window, and the defendant's recollection of the property that they had stolen. We agree with the state. Mejia, the resident at 475 Myrtle Street, testified that Officer Citron, who responded to her telephone call, did not detect the sliced glass, and that she and her husband discovered it after Citron had

left. Mejia further testified that she had not told the police about the sliced glass or the additional stolen property that was discovered only after Citron had departed. Detectives Durkin and Masternak testified that they first had learned of the sliced glass and the additional stolen property at 475 Myrtle Street when the defendant had told them about it. The police subsequently investigated the defendant's information and discovered that it was true.

In addition to independent physical evidence, the state introduced the defendant's confession into evidence. We have held that "a confession, if sufficiently corroborated, is the most damaging evidence of guilt . . . and in the usual case will constitute the overwhelming evidence necessary to render harmless any errors at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Shifflett*, 199 Conn. 718, 752, 508 A.2d 748 (1986). In the present case, the defendant's statement to the detectives, which was admitted into evidence after a suppression hearing, was drafted over a period of hours as the detectives drove with the defendant throughout the neighborhood and recorded on a laptop computer all that the defendant told them. Both detectives further testified that the defendant read and signed the statement. The fact that the defendant contests the circumstances surrounding the statement and the detectives truthfulness in relation to it, does not, in and of itself, render his confession devoid of evidentiary value. The state's case may not have been ironclad; however, "we have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial misconduct did not deprive the defendant of a fair trial." *State* v. *Thompson*, supra, 266 Conn. 483. We conclude that the Appellate Court undervalued the strength of the state's case against the defendant and, therefore, its determination

that the assistant state's attorney's conduct was harmful enough to warrant reversal was improper.

## D

### Curative Instructions

The state finally claims that the Appellate Court improperly concluded that the trial court's "instructions to the jury were insufficient to cure" the assistant state's attorney's misconduct. *State* v. *Stevenson*, supra, 70 Conn. App. 45. We agree with the state.

We note that the trial court gave no specific curative instructions, nor did the defendant request any such instructions. Furthermore, the defendant did not object to one of the two instances of misconduct at issue. We previously have stated that "the defendant, by failing to bring them to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument [or cross-examination questions] when [they were] made suggests that defense counsel did not believe that [they were] unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments [or cross-examination questions] that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to [them] or because he or she wants to later refute that argument [or line of questioning]." (Citations omitted; internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 414. The same principles hold true in regard to requests for special instructions. The failure by the defendant to request specific curative instructions frequently indicates on appellate

review that the challenged instruction did not deprive the defendant of a fair trial.

In addition, even though the trial court gave no specific curative instructions, the court reminded the jury in its general instructions, both prior to trial and again following final argument, that "what the lawyers may have said to you in argument about the facts is not testimony or evidence, as I have said to you several times. It's what comes out of the witness chair, under oath, that is evidence." The court further reminded the jury that the state has the burden of proof as to every element of the crimes charged. Finally, the court instructed the jury that assessments of credibility in relation to all of the witnesses lies solely with it. We have stated that "[t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Fields*, supra, 265 Conn. 207. We conclude, therefore, that the court's instructions, when viewed in light of the other *Williams'* factors, were sufficient to cure any harm to the defendant caused by the assistant state's attorney's misconduct.[19]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendant's remaining claim on appeal.

In this opinion the other justices concurred.

---

[19] As an alternate ground for affirmance, the defendant claims that, even if we do not find the assistant state's attorney's conduct egregious enough to have deprived the defendant of a fair trial, we should affirm the Appellate Court's judgment in accordance with our supervisory authority over the administration of justice; see *State* v. *Reynolds*, supra, 264 Conn. 215–17; or as plain error. Suffice it to say that we see no reason to invoke either of these extraordinary remedies in this case.