******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JONATHAN ALBINO
(SC 18866)
(SC 18867)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Vertefeuille, Js.

*Argued October 30, 2013—officially released August 5, 2014*

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Patrick J. Griffin*, senior assistant state's attorney, and *Raheem L. Mullins*, former assistant state's attorney, for the appellant in Docket No. SC 18866 and the appellee in Docket No. SC 18867 (state).

*Pamela S. Nagy*, assigned counsel, for the appellee in Docket No. SC 18866 and the appellant in Docket No. SC 18867 (defendant).

*Opinion*

McDONALD, J. Following our grants of certification, the defendant, Jonathan Albino, and the state separately appealed from the Appellate Court's judgment affirming the defendant's conviction of murder in violation of General Statutes § 53a-54a. In his appeal, the defendant challenges the Appellate Court's determination that only certain statements by the prosecutor during trial and closing argument were improper, and that those improprieties did not deprive the defendant of a fair trial. In its appeal, the state contends that, in deeming one category of statements improper, the Appellate Court improperly extended this court's holding in *State v. Singh*, 259 Conn. 693, 712, 793 A.2d 226 (2002), which barred the prosecutor from asking a defendant whether another witness' conflicting testimony is "wrong," to the prosecutor's closing argument. We conclude that the state's appeal must be dismissed because the state is not aggrieved by the judgment of the Appellate Court, but we nonetheless consider its claim as an alternative ground for affirmance. We further conclude that the defendant was not deprived of a fair trial. Accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following facts that the jury reasonably could have found. "[The defendant] worked daily selling heroin behind a three-story apartment building located at 132 Locust Street in Waterbury (building). He [only speaks Spanish], and most of his customers . . . spoke Spanish. The heroin selling operation was run by William Ramos . . . . Ramos employed approximately five or six young men, including the defendant . . . . During his shift, which usually was from 3 to 10 p.m., the defendant carried a loaded firearm.

"On September 18, 2006, the defendant worked [past] his usual shift . . . . During that time [people attending a party in the building] were congregating both inside and outside the building, while loud music played. Ramos, who testified for the state, was on the second floor of the building overseeing his drug selling operation. At approximately 10:30 p.m., the defendant was sitting on the stairs just above the second floor landing when the victim, Christian Rivera, approached the building on a bicycle [and then left the bicycle in front of the building]. When Rivera approached the [dimly lit] stairwell, he had his hands in his pockets, and he was wearing a hooded sweatshirt with the hood up. The defendant descended the stairwell, thinking that Rivera was there to purchase heroin.

"As Rivera approached the landing, the defendant, who could not see Rivera's face, instructed him in Spanish to remove his hands from his pockets and to take down the hood of his sweatshirt. Rivera did not respond to the defendant's instructions and continued his

approach. Rivera was not acting in an aggressive manner, and Ramos saw nothing in Rivera's actions that caused him concern. As the defendant and Rivera came [close to] one another, the defendant pushed Rivera and again ordered him to take his hands out of his pockets and to remove his hood. Again, Rivera did not respond to the defendant, kept his hands in his pockets and continued to move forward. The defendant pushed Rivera a second time and felt something hard in Rivera's pocket. The defendant then brandished a nine millimeter semiautomatic firearm, pulled back the slide and aimed the firearm at Rivera. . . . [Seconds later, the] defendant fired the weapon approximately eight times at close range, hitting Rivera four times. The defendant stopped firing when Rivera fell to the ground. . . . Rivera died as a result of these gunshot wounds. When the police found Rivera's body, he had no weapons, money or identification on him. He did, however, have a bottle of Poland Spring water in his pocket. The medical examiner's office determined that . . . three of the four bullets that struck Rivera . . . entered from the back of his body [and the fourth entered from his left side].

"Immediately after the shooting, the defendant ran upstairs and gave the firearm to his friend, Angel Garcia, and then left the scene. The defendant removed the red T-shirt he had been wearing and discarded it into some bushes. He later telephoned his friend, Jose Velez, telling Velez that he needed to get away because he had shot someone. . . . During [a subsequent car] ride [accompanying Velez to New York], the defendant told Velez and the other men in the vehicle, Luis Rios and Zachary Gonzalez, that he had shot a man on Locust Street because the man would not respond to his orders. . . . [The following day, the defendant learned that an arrest warrant had been issued for him, and on the evening of September 20, 2006, he turned himself in to the Waterbury police].

"Thereafter, the defendant was advised, in Spanish, of his *Miranda*[1] rights. He waived his rights . . . and willingly offered to tell his story to Detective George Tirado and Sergeant Michael Slavin. Although Tirado was able to communicate verbally with the defendant in Spanish, he was concerned about his ability to transcribe the defendant's written statement. Therefore, a state certified high school Spanish teacher, Yesenia Diaz, was called upon to transcribe the defendant's written statement in Spanish. . . . In his statement, the defendant admitted to shooting Rivera [and to stopping only when he saw Rivera fall to the ground, at which point he ran up the stairs]. The defendant further admitted that he had fired at Rivera because, as Rivera walked toward him, Rivera ignored [the defendant's] commands [to] remove his hands from his pockets and take off his hood. [The defendant offered no other explanation for the shooting.]" (Footnote in original.) *State* v.

*Albino*, 130 Conn. App. 745, 747–50, 24 A.3d 602 (2011).

The record reveals the following additional facts. During the defendant's trial on the charge of murder, he took the stand and asserted that he had shot Rivera in self-defense. According to the defendant, in addition to Rivera's failure to heed the defendant's command to take his hands out of his pockets, he also said, as he came close to the defendant, "give me the drugs, give me the money." In response, the defendant told Rivera that he was crazy and pushed him, but Rivera continued to walk up the stairs. When the defendant pushed Rivera a second time, he felt something hard in Rivera's pocket and feared that this object might be a gun. In response, the defendant pulled out his gun and engaged the mechanism that readied it to discharge, initially pointing it at the ground. When Rivera continued toward the defendant without heeding the defendant's repeated demand to take his hands out of his pockets, the defendant feared that Rivera would shoot him. At that point, the defendant started shooting at Rivera, while retreating backward up the stairs, until there were no bullets left in the gun. As the defendant turned to flee, Rivera was still standing. The defendant fled from Waterbury because he feared that Rivera would come after him.

In support of his theory, the defendant attempted to impeach the state's witnesses regarding their accounts of his actions and statements. He also offered the following affirmative evidence. To explain his capacity to give a less than full and accurate statement to the police, he presented evidence of his low IQ, just above the threshold for mental retardation. To explain the eight shots fired, the defendant offered expert testimony regarding "reflex trigger pull," a phenomenon that occurs when a person confronted with a life-threatening situation holds a gun so tightly that he may reflexively discharge numerous rounds before his mind can signal his hand to release the trigger. To bolster his robbery claim, the defendant offered hostile witness testimony from Rivera's sister, who acknowledged that Rivera had been selling and using drugs and that he had been worried about a $240 drug debt. The defendant also offered evidence that Rivera had pleaded guilty to charges of attempt to commit assault in the third degree and reckless endangerment for conduct that had occurred two years before his death, for which he had received one year suspended sentences.

The court instructed the jury on the charged offense of murder, as well as the justification of self-defense, and on the lesser included offenses of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a and manslaughter in the second degree with a firearm in violation of General Statutes § 53a-56a. The jury found the defendant guilty of murder, and the trial court rendered judgment in accordance with the verdict, imposing a term of fifty years

imprisonment.

The defendant directly appealed to this court from the judgment; see General Statutes § 51-199 (b); raising three challenges to his conviction, including that he had been deprived of a fair trial because of improper statements made by the prosecutor during trial and in closing argument. We transferred the appeal to the Appellate Court, where the defendant contended with respect to that claim that the prosecutor: "(1) repeatedly commented on the guilt of [the] defendant and attempted to influence the jury by his persistent use of the terms victim, murder, and murder weapon throughout the trial; (2) argued that to acquit [the] defendant, the jury would have to find that every other witness was wrong in violation of *State* v. *Singh*, [supra, 259 Conn. 693]; (3) appealed to the jurors' passions and emotions; (4) denigrated the integrity of defense counsel in closing argument; and (5) attempted to influence the jurors about the credibility of his witnesses through improper means." (Internal quotation marks omitted.) *State* v. *Albino*, supra, 130 Conn. App. 756. The Appellate Court concluded that only the first and second categories of the challenged statements were improper, as well as part of the challenged statements in the fifth category insofar as the prosecutor had asked state witnesses whether they were testifying truthfully, but ultimately held that the defendant was not deprived of a fair trial. Id., 758–82. The court rejected the defendant's other claims and affirmed the judgment of conviction. Id., 756, 784.

We thereafter granted the defendant's petition for certification to appeal, limited to the issue of whether the Appellate Court properly concluded that the defendant was not deprived of a fair trial. *State* v. *Albino*, 302 Conn. 941, 29 A.3d 466 (2011). We also granted the state's petition for certification, limited to the issue of whether the Appellate Court improperly extended and applied this court's holding in *Singh* to the prosecutor's closing argument regarding the jury's weighing of conflicting testimony. *State* v. *Albino*, 302 Conn. 940, 29 A.3d 466 (2011).

I

We first address the state's appeal in light of a jurisdictional defect that mandates its dismissal. It is apparent upon further reflection that the state lacks the aggrievement necessary to appeal from the judgment of the Appellate Court.

It is settled law that a party must be aggrieved by the judgment in order to have standing to appeal therefrom. See *Gold* v. *East Haddam*, 290 Conn. 668, 676, 966 A.2d 684 (2009); see also General Statutes § 51-197f (limiting right of review of Appellate Court judgment by way of "petition by an aggrieved party"). Such aggrievement may be established when a party has pre-

vailed on the merits but nonetheless has not received the full measure of relief requested. See *State* v. *T.D.*, 286 Conn. 353, 358–59, 944 A.2d 288 (2008). By contrast, aggrievement generally is lacking when a party has prevailed on the merits and has obtained the relief sought but is unsatisfied with the rationale articulated in support of the judgment. See *State* v. *Preston*, 286 Conn. 367, 373 n.4, 944 A.2d 276 (2008).

Although we recognize that the state is bound by the courts' determinations of the limits of proper prosecutorial conduct, we now are persuaded that the state's appeal falls into the second category, as the Appellate Court has affirmed the judgment in which the defendant was convicted of the greater offense charged by the state. This is not to say, however, that the state lacks any avenue to contest the Appellate Court's determination as to prosecutorial impropriety. When, as in the present case, the adverse party is aggrieved and does appeal, the nonaggrieved party may raise such a claim as an alternative ground for affirmance. Id. Because this issue has been fully briefed by the parties and is intertwined with issues raised in the defendant's appeal, we address the state's claim in our resolution of that appeal. Accordingly, the state's appeal is dismissed.

II

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, *regardless of its ultimate effect on the fairness of the trial.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 36, 975 A.2d 660 (2009).

We first address those statements that the defendant contends should have been deemed improper by the Appellate Court and then turn to the statements that the state contends were proper, contrary to the Appellate Court's conclusion. In light of those conclusions, we turn to the question of whether the sum of any improprieties deprived the defendant of a fair trial. For the reasons set forth subsequently in this opinion, although our conclusions differ from some of the Appellate Court's conclusions as to the propriety of certain statements, we agree that the defendant was not deprived of a fair trial.

A

"Prosecutorial impropriety can occur during both the cross-examination of witnesses and in the course of closing or rebuttal argument." Id., 37. In reviewing claims of such impropriety, we apply well established standards. See generally *State* v. *Medrano*, 308 Conn. 604, 610–12, 619–21, 65 A.3d 503 (2013). Briefly stated,

the prosecutor, as a public official seeking impartial justice on behalf of the people of this state, "has a heightened duty to avoid argument [or questioning] that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) Id., 612. Nonetheless, we have recognized that "the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . ." (Internal quotation marks omitted.) Id.

1

Improper Appeals to the Jurors' Emotions,

Passions and Prejudices

We begin with the defendant's claim that certain references to Rivera during closing argument were improper appeals to the jurors' emotions, in that they either focused on factors that had nothing to do with the defendant's guilt or innocence or used overly dramatic language.[2] See *State* v. *Camacho*, 282 Conn. 328, 375, 924 A.2d 99 (recognizing that such statements are improper), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007); *State* v. *Alexander*, 254 Conn. 290, 307, 755 A.2d 868 (2000) (same). It must be acknowledged that the line between comments that risk invoking the passions and prejudices of the jurors and those that are permissible rhetorical flourishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible. See *State* v. *Camacho*, supra, 375 ("[s]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence" [internal quotation marks omitted]). Thus, we conclude that comments that Rivera was "peppered with bullets" and that "the first bullet tore into his body" were not improper as they are factually accurate descriptions of the evidence that were not unduly provocative.

Several other comments did, however, stray beyond that line. At oral argument before this court, the state conceded that the prosecutor improperly had argued that Rivera was alone as he approached the defendant and his crew but that "Rivera won't be alone anymore, because you're going to get this case." See *State* v. *Williams*, 204 Conn. 523, 547, 529 A.2d 653 (1987) ("[i]t is improper for the prosecutor to encourage the jury to identity with the victim"). We also conclude that gratuitous comments about the defendant "executing" Rivera and committing "murder in cold blood" were improper, considering that the defendant's evidence was deemed sufficient to warrant jury instructions on lesser included offenses inconsistent with a wholly unprovoked act of brutality that has been deemed by courts to justify the use of such terms. Compare *State* v. *Medrano*, supra, 308 Conn. 616 (prosecutor's statement

that defendant acted as victim's " 'judge, jury and executioner' " was improper); *Duckett* v. *State*, 919 P.2d 7, 19 (Okla. Crim. App. 1995) ("'[d]on't you be a party to letting a cold-blooded killer loose' " deemed improper argument); *Commonwealth* v. *Bricker*, 506 Pa. 571, 586, 487 A.2d 346 (1985) (improper to refer to defendant as cold blooded killer); *Commonwealth* v. *Brown*, 490 Pa. 560, 566–68, 417 A.2d 181 (1980) (description of shooting as "execution" improper but not prejudicial if invited by defense counsel); *Nolan* v. *State*, 568 S.W.2d 837, 840 (Tenn. Crim. App. 1978) (comment about murder in " 'cold blood' " deemed improper), with *Commonwealth* v. *Murphy*, 442 Mass. 485, 496, 813 N.E.2d 820 (2004) (statement that victims were murdered " 'in cold blood' " not improper where evidence permitted inference that murders were unprovoked, senseless, and brutal); *People* v. *Walton*, Docket No. 259584, 2006 WL 2033999, *2 (Mich. App. July 20, 2006) (prosecutor's characterization of offense as " 'execution' " not improper because clearly supported by evidence that defendant and accomplices made unarmed victims lie down on floor and then shot them); *State* v. *Harris*, 338 N.C. 211, 229, 449 S.E.2d 462 (1994) (at trial for first degree murder involving calculated armed robbery and unprovoked killing, it was not improper for prosecutor to refer to defendant as " 'cold-blooded murderer' ").

In addition, we see no connection between the issues in the present case and the prosecutor's comment regarding "the indignity of death" when showing the jury Rivera's autopsy photograph. Because the lack of dignity in Rivera's appearance has no relevance to the issues in the present case, this statement would seem calculated solely to appeal to the jurors' emotions.[3] Lacking relevance to the elements of the charged offenses, we disagree with the state that this comment falls within the rule permitting the prosecutor to argue an inference that the jury could have drawn entirely on its own based on the evidence presented. See *State* v. *Stevenson*, 269 Conn. 563, 585, 849 A.2d 626 (2004) (prosecutor properly argued that state's witnesses did not have motive to lie, whereas defendant and his witnesses did have such motive).

2

## Impugning Defense Counsel

We next turn to the defendant's claim that the prosecutor improperly characterized defense counsel's strategy in a manner to suggest that he employed tactics intended to mislead the jury.[4] See *State* v. *Orellana*, 89 Conn. App. 71, 101, 872 A.2d 506 (distinguishing between improper argument disparaging integrity or role of defense counsel and proper argument disparaging theory of defense), cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). During trial, the defendant elicited evidence intended to call into question whether the

police had coerced several state witnesses into giving statements adverse to the defendant. In his closing argument, the prosecutor analogized the defense strategy to an octopus' defense mechanism of shooting ink into the water, thus muddying the water so the octopus can escape.[5] The prosecutor also referred to the defense strategy as a "shotgun approach. You shoot it against the wall and you hope that something will stick." These statements were improper and our recent comments deeming the use of effectively similar terms improper bear repeating: "We previously have expressed our disapproval of a prosecutor's use of [the] term [smoke and mirrors], even as an isolated reference . . . because it implie[s], to whatever degree, that defense counsel had not based his argument on fact or reason . . . but had intended to mislead the jury by means of an artfully deceptive argument. . . . Indeed . . . a prosecutor who uses the phrase smoke and mirrors implie[s] that the defendant's attorney intended to deceive and thereby impugn[s] the integrity of the defendant's attorney."[6] (Citation omitted; internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 557, 78 A.3d 828 (2013). We further explained in *Maguire* that this impropriety was compounded by, inter alia, statements that "defense counsel . . . had attempted to sidetrack the jury through misdirection and by all of the 'stuff' that he 'tried to throw against the wall' during his closing remarks to the jury. Of course, if the prosecutor had wished to focus the jury on weaknesses in the defendant's theory of defense, there were ample ways for her to do so that would not have involved belittling remarks or personal attacks on the credibility of the defendant and defense counsel." (Footnote omitted.) Id., 557–58.

### 3

### Bolstering the Witness' Credibility

The defendant also contends that the prosecutor improperly bolstered the credibility of Carlos Ayala, a jailhouse informant testifying for the state.[7] Ayala testified regarding a conversation he had had with the defendant in which the defendant's account of the shooting was consistent with the statement he had given to the police, including the omission of any facts indicative of an attempted armed robbery. Before giving that testimony, Ayala acknowledged that he hoped to obtain favorable treatment from the state regarding pending charges in his own case, but stated that no one from the Office of the State's Attorney had discussed his case or made any promises to him. In subsequent direct examination, the prosecutor made statements reiterating that the state had not promised Ayala anything in exchange for his testimony and that Ayala was free to change his story. See footnote 7 of this opinion. Then, in closing argument, the prosecutor stated: "[T]he state's not promising anything to . . . Ayala and he

made that clear to you, and *we make it clear to the jury.*" (Emphasis added.)

Because the prosecutor effectively testified to the state's lack of any promises to Ayala in the guise of questioning, such statements were improper. See *State* v. *Singh*, supra, 259 Conn. 717 ("[a] prosecutor . . . shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness" [internal quotation marks omitted]). Contrary to the Appellate Court's conclusion, it is irrelevant to the impropriety analysis whether Ayala also testified that the state had offered him no promises in exchange for his testimony, although such a fact would bear on the ultimate due process question. By reiterating the lack of promises, the prosecutor impermissibly bolstered Ayala's credibility. This inference was compounded by the statement in closing argument using the collective pronoun "we," thus aligning Ayala with the state. "[Although a] prosecutor is permitted to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002); see also *State* v. *Thompson*, 266 Conn. 440, 462, 832 A.2d 626 (2003) ("[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." [Internal quotation marks omitted.]).

4

The Jury's Duty to Convict Argument

Finally, the defendant claims that the prosecutor improperly argued that it was the jury's duty to convict the defendant of the crime charged. We note, however, that the prosecutor actually indicated that, *if* the jury held the state to its burden of proof and considered the evidence, the jury had a duty to convict the defendant of murder rather than one of the lesser included offenses.[8] We further note that, in his closing and rebuttal arguments, the prosecutor also argued to the jury that, if it believed that Rivera had confronted the defendant for the purpose of robbing him and that the defendant was justified in acting in self-defense, the jury should find him not guilty. Thus, the statement at issue does not suffer from the defect that this court previously has identified in cases in which the "do your duty" argument was linked to matters external to the case or unconnected to the evidence. See *State* v. *Reynolds*, 264 Conn. 1, 183, 836 A.2d 224 (2003) ("it generally is improper for the state to argue that the jurors' oath obligates them to return a particular verdict because such language poses a risk of diverting the jury from

its duty of deciding the case on the basis of the evidence and the applicable law"), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see, e.g., *State v. Ceballos*, 266 Conn. 364, 395, 832 A.2d 14 (2003) (statement by prosecutor improper that pointed to child victim's courage in doing her part by testifying and then added " '[w]ith all due respect, ladies and gentlemen, it's now time for you to do your part' "); *State v. Whipper*, 258 Conn. 229, 271 and n.19, 780 A.2d 53 (2001) (prosecutor improperly suggested that jury had duty, as members and representatives of community, to convict defendant), overruled in part on other grounds by *State v. Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004), and *State v. Grant*, 286 Conn. 499, 535, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008). Nor does it suffer from the defect that appears in the cases from other jurisdictions on which the defendant relies, in which such a statement was made in isolation, without reference to the evidence in the case.[9] See, e.g., *United States v. Young*, 470 U.S. 1, 18, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985); *United States v. Sanchez*, 176 F.3d 1214, 1224–25 (9th Cir. 1999); *Redish v. State*, 525 So. 2d 928, 929–30 (Fla. App. 1988); *State v. Scott*, 286 Kan. 54, 79, 183 P.3d 801 (2008). Instead, in making the "do your duty" comment, the prosecutor "did not invite the jury to abdicate a rational appraisal of the evidence and to decide the case on its emotions"; *State v. Garrett*, 42 Conn. App. 507, 514 n.8, 516, 681 A.2d 362, cert. denied, 239 Conn. 928, 929, 683 A.2d 398 (1996); because he reminded the jurors to reach a verdict on the basis of the evidence and the state's burden of proof. See also *United States v. Sanchez*, supra, 1225 (suggesting that "[i]t is probably appropriate for a prosecutor to argue to the jury that 'if you find that every element of the crime has been proved beyond a reasonable doubt, then, in accord with your sworn duty to follow the law and apply it to the evidence, you are obligated to convict, regardless of sympathy or other sentiments that might incline you otherwise' ").

Although we conclude that the particular comment in the present case was not improper, no doubt "[t]here is perhaps a fine line between a proper and improper 'do your duty' argument." Id.

B

Having reviewed the statements that the defendant contends were improper, contrary to the conclusions of the Appellate Court, we now turn to the state's claim that the Appellate Court improperly concluded that certain statements in the prosecutor's closing argument violated the rule set forth in *State v. Singh*, supra, 259 Conn. 712, regarding characterizing witnesses' testimony as "wrong." The state contends that *Singh* did not extend this prohibition to closing argument. We conclude that the Appellate Court went too far in construing *Singh* as articulating a per se rule that applies

equally to the questioning of witnesses and statements in closing argument as to this particular term. Nonetheless, we conclude that, under the facts and circumstances of the present case, the prosecutor's comments, viewed collectively, violated the principles in *Singh*.

In the present case, the prosecutor stated in his closing argument: "Ladies and gentlemen, in order for you to find the defendant not guilty of the crime of murder, you have to find that *everybody is wrong* in this case. The police are *wrong*. The detectives who interviewed him are *wrong*. The defendant's own friends and associates are *wrong*. . . . Yesenia Diaz is *wrong*, the interpreter. Right? And almost incredible, you've got to find that the defendant's own statement is *wrong*, that he was *wrong*, because he didn't tell the cops that he acted in self-defense. You can't do that. You can't do that." (Emphasis added.)

Then, in his rebuttal argument, the prosecutor stated: "Now, ladies and gentlemen, remember the language the defendant used when he took the stand. He tells you that this statement is not a verbatim transcript of what was said in there. So what he's done is *he's saying that . . . Yesenia Diaz has testified untruthfully. He's testifying truthfully. She's testifying untruthfully.* And therein lies one of the central roles of the jury, right, you've got to decide whose credibility you believe. . . .

\* \* \*

"[Yesenia Diaz] is a window for you into the interview room. If you find that she's not credible, then you find the defendant's version credible, because they're in complete conflict, aren't they? They're in conflict. Ladies and gentlemen, in order for you to find the defendant not guilty you have to find that *every single person in this case is wrong. William Ramos, Edwin Gonzalez, Luis Rios, Aida Perez, Carlos Ayala, Detective Milford Hayes, who tells you how Edwin Gonzalez' statement was taken. Detective George Tirado, Detective Mike Slavin . . . Yesenia Diaz and the defendant himself*." (Emphasis added.)

With this background in mind, we turn to our decision in *State* v. *Singh*, supra, 259 Conn. 693. In *Singh*, the defendant had contended that the prosecutor improperly asked him to characterize testimony of other witnesses during cross-examination and improperly emphasized that testimony in closing argument. Id., 702. Specifically, on cross-examination, the prosecutor repeatedly asked the defendant whether testimony that conflicted with his own was incorrect, made up, wrong or a lie. Id., 702–703. Then, in closing argument, the prosecutor argued that the defendant would have the jury believe that " 'everyone else' " whose account conflicted with his own or offered unfavorable testimony had lied. Id., 705–706. In addressing the defendant's

claim, this court explained: "We previously have not had the opportunity to address the well established evidentiary rule [in other jurisdictions] that it is improper to ask a witness to comment on another witness' veracity. . . . A few of these courts have drawn a distinction between using the words wrong or mistaken rather than lying in questions and closing arguments, concluding that the former terms are not improper because they merely [highlight] the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a liar. . . .

"Several reasons underlie the prohibition on such questions. First, it is well established that determinations of credibility are for the jury, and not for witnesses. . . . Consequently, questions that ask a defendant to comment on another witness' veracity invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence. . . .

"Second, questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . This risk is especially acute when the witness is a government agent in a criminal case. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . such as misrecollection, failure of recollection or other innocent reason. . . .

"Similarly, courts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 706–10.

Ultimately, this court declined "the state's invitation to carve out an exception to the rule that a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong" in cases in which the defendant's testimony contradicts another witness' testimony. Id., 712. This court then added: "Moreover, closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are similarly improper." Id. We explained in a footnote to the first sentence that

addressed the questioning of witnesses that we would not "make [a] distinction between using the word 'wrong' as opposed to 'lying.' . . . Although questioning whether a witness' testimony is wrong may, at first blush, seem less egregious, we conclude that it is nonetheless improper because it requires the witness to characterize testimony and may lead to the same problematic results." (Citations omitted.) Id., 712 n.16.

Thus, in *Singh*, this court identified as its principal concern relating to asking a witness to characterize another witness' testimony as wrong a concern that is not implicated in closing argument, namely, that such questions improperly invade the province of the jury to make credibility assessments. See id., 706–707. It was due to this concern that we declined to allow the prosecutor to use the term "wrong," despite the fact that courts have recognized that this term is sufficiently broad to encompass various reasons other than lying that would explain conflicting testimony. Id., 708. In other words, irrespective of whether the prosecutor frames the question to ask a defendant whether another witness is wrong, mistaken or has lied, the question equally calls on the defendant to characterize the witness' testimony. By contrast, when the prosecutor argues that the jury must conclude that one of two versions of directly conflicting testimony must be wrong, the state is leaving it to the jury to make that assessment. Moreover, by framing the argument in such a manner, the jury is free to conclude that the conflict exists due to mistake (misperception or misrecollection) or deliberate fabrication.

Therefore, we disagree with the clear implication in the Appellate Court's decision in the present case that it would be improper under *Singh* for a prosecutor simply to state in closing argument that, where there are two directly conflicting accounts of an incident, one must be wrong. See *State* v. *Albino*, supra, 130 Conn. App. 766. On the other hand, we also disagree with the state that the use of the term "wrong" instead of "lying" always will be proper argument. *Singh* underscored a particular concern with argument that "involves a distortion of the government's burden of proof." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 709. For this reason, we concluded that "closing arguments providing, *in essence*, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are . . . improper." (Emphasis added.) Id., 712. Thus, *Singh* left open the possibility that a prosecutor's argument could make this suggestion to the jury without using the word "lying."

We conclude that, in the present case, although no single comment in isolation may have violated the rule articulated in *Singh* regarding closing argument, the comments viewed in totality did so. Indeed, the comments implicated many of the concerns that we had

identified in *Singh*. The prosecutor made a direct connection between the defendant's acquittal and the credibility of every other witness in the case. Cf. *State* v. *Wright*, 76 Wn. App. 811, 824–25, 888 P.2d 1214 (1995) ("The argument made here did not present the jury with a false choice between believing the [s]tate's witnesses or acquitting [the defendant]. Therefore, it was not misleading."). With respect to one witness, Diaz, the state specifically argued that the defendant had characterized her testimony as a lie, when he had not done so. By then stacking the testimony of every single state witness, including Diaz, against that of the defendant, the jury undoubtedly could have inferred that the prosecutor was arguing that, to acquit the defendant, the jury would have to conclude that every other witness had lied.[10] Cf. *People* v. *Dace*, 237 Ill. App. 3d 476, 485, 604 N.E.2d 1013 (1992) (concluding that prosecutor's comment in closing argument that " 'if you want to let this defendant walk . . . tell all these [witnesses] they are wrong' . . . impermissibly misstated the law and distorted the burden of proof by telling the jury, in effect, it could find the defendant not guilty only if it believed the [s]tate's witnesses were all lying or mistaken").

The prosecutor's argument also precludes the possibility that the jury could have either credited parts of both the testimony of state witnesses (including the defendant's police statement) and the defendant's trial testimony or reconciled evidence that the state claims was in direct conflict. While the state views the defendant's failure to mention the gun or robbery threat to the police as *directly conflicting* with his trial testimony, the defendant's statements to the police and others arguably can be reconciled with his testimony. The defendant told the police that he had shot Rivera after Rivera did not comply with the defendant's commands to take his hands out of his pockets. The jury could have concluded that the defendant's fear that Rivera would use the gun in his pocket would have been allayed if Rivera had obeyed the defendant's command. In light of the testimony of the defendant's expert regarding the defendant's limited intellectual capacity, the jury may have believed that these two things—the gun in Rivera's pocket and Rivera's removal of his hands from his pockets—were inextricably linked in the defendant's mind and, because of his inability to appreciate the need to volunteer such information to the police, the defendant simply answered the questions as he understood them. Although, for reasons set forth in part II C of this opinion, we do not believe that the jury would have drawn such a conclusion, it was improper for the prosecutor to argue to the jury that it would have to find that every witness was wrong in order to acquit the defendant.

C

In light of our conclusions set forth previously in this

opinion, we now must consider whether the sum of the improprieties deprived the defendant of a fair trial. Those improprieties include, in addition to those discussed in parts II A and B of this opinion, the following statements deemed improper by the Appellate Court that the state has conceded for purposes of this appeal: (1) improper expressions of opinion as to the guilt of the defendant and the credibility of witnesses by referring repeatedly to the "victim," "murder," and "murder weapon" when the defendant claimed that no crime had occurred because the killing was justified as self-defense;[11] *State* v. *Albino*, supra, 130 Conn. App. 759; and (2) improper attempts to influence the jury about the credibility of the state's witnesses by asking certain witnesses whether they were telling the truth or were prepared to tell the truth. Id., 772. We conclude that the defendant was not deprived of a fair trial.

When a defendant demonstrates improper questions or remarks by the prosecutor during the course of trial, the defendant bears the burden of showing that, "considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 620. "The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." *State* v. *Thompson*, supra, 266 Conn. 460. This assessment is made through application of "the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, with due consideration of whether that misconduct was objected to at trial. . . . These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Medrano*, supra, 619–20.

We note at the outset that the defendant made no objection to any of these remarks and took no measures to seek curative instructions. Therefore, he "bears much of the responsibility for the fact that [these] claimed impropriet[ies] went uncured." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 402, 897 A.2d 569 (2006). Moreover, a fair implication can be inferred that the defendant did not view the remarks to be unduly prejudicial. See id. ("defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument" [internal quotation marks omitted]).

We conclude that the improper remarks were not invited by defense counsel, that many of the improprieties related in varying degrees to a central issue in the case—the credibility of the defendant's claim of self-defense, and that the improprieties spanning both the examination of witnesses and closing argument were not isolated. See *State* v. *Angel T.*, 292 Conn. 262, 289–90, 973 A.2d 1207 (2009) (state elicited improper evidence through two witnesses and discussion of this evidence during both opening and rebuttal summations deemed frequent); *State* v. *Warholic*, supra, 278 Conn. 398 ("the instances of prosecutorial misconduct were not isolated because they occurred during both the cross-examination of the defendant and the prosecutor's closing and rebuttal arguments"). Nonetheless, we conclude that the remaining factors clearly support a conclusion that the improprieties did not deprive the defendant of a fair trial.

With respect to the strength of the curative measures adopted, the defendant's failure to object or to ask for such measures to be taken deprived the court of an opportunity to address the improprieties with any specificity. Nonetheless, the court's general instructions, a written copy of which was provided to the jury, likely mitigated the effect of some of the improprieties. The court instructed the jury that it should not be influenced by sympathy or prejudice, that the jury was the sole arbiter of facts, that attorneys' arguments are not evidence, that conflicts in testimony may be due to factors other than dishonesty, and that it is proper to consider the credibility of a witness with pending charges in light of the witness' interest in receiving favorable treatment from the state.

With respect to the severity of the improprieties, we conclude that the defendant's failure to object is consistent with our view that many of the improprieties were just over the line of acceptable conduct.[12]

In the end, the defendant's claim founders on the final factor of the *Williams* test, the strength of the state's case. In particular, the physical evidence and the defendant's own testimony demonstrate why there is not a reasonable likelihood that the jury's verdict would have been different absent the improprieties. There is no dispute that the defendant shot Rivera, that he discharged eight bullets and that four of these hit Rivera. Not one of the bullets entered the front of Rivera's body; all of the bullets entered Rivera's back or his left side. Therefore, the position of Rivera's body was not consistent with a posture of aggression but one of retreat.

According to the defendant's own testimony, Rivera never acted in an aggressive manner toward him. The defendant conceded that Rivera's purported statement asking for the drugs and the money was not made in

a threatening tone. Rivera never claimed to have a gun or any other weapon or threatened any harm to the defendant. The defendant never claimed that Rivera had pointed the object in his pocket at the defendant. When the defendant twice pushed Rivera, who was shorter and smaller than the defendant, Rivera never responded in kind but just continued up the stairs.

The defendant's claim that Rivera came to the building to rob him also lacks credibility in light of the circumstances to which he and others testified: Rivera arrived by bicycle and numerous other people—partygoers and other armed drug dealers working for Ramos—were nearby. There is no evidence that the defendant called out to warn others that Rivera had a gun or to otherwise indicate that Rivera was there to do harm before he shot Rivera. Nor is there evidence that he warned others when fleeing the scene, which not only undermines his claim that Rivera had a gun but also his claim that Rivera was still standing when the defendant fled the scene.

Finally, the defendant's statements to others strongly support the conclusion that the defendant fabricated the robbery. The defendant's claim that his failure to include any mention of the attempted robbery in his statement to the police was due to his low IQ is undermined by the fact that the defendant purposefully lied in that statement regarding his drug dealing so as not to get either himself or Ramos into trouble. Even if the defendant's intellectual limitations could have impacted his ability to appreciate the need to make a full disclosure in response to police questioning, it does not explain the fact that no friend or acquaintance with whom the defendant spoke about the shooting indicated that the defendant ever had mentioned that Rivera tried to rob him or that he thought Rivera had a gun. In light of all this evidence, as well as consciousness of guilt evidence, we conclude that the sum total of any improprieties did not deprive the defendant of a fair trial.

The appeal in SC 18866 is dismissed; the judgment of the Appellate Court in SC 18867 is affirmed.

In this opinion ROGERS, C. J., and EVELEIGH and VERTEFEUILLE, Js., concurred.

[1] v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] The defendant challenges the following portions of the state's closing argument: "No one asks you to forgive the life that William Ramos has led. But are you prepared to say that if a man commits *murder in cold blood* in front of a witness who has a criminal record that he can walk away because the witness has a felon[y] record? Are you prepared to say that? . . .

\* \* \*

"Isn't that what [the defendant] told you? But I thought [Rivera] or I thought the man I shot might be chasing after me. That would be this guy, right, that's *peppered with bullet holes. Peppered with bullet holes*. . . .

"Now, ladies and gentlemen, one of the most difficult things about this case, or about any murder case, is the fact that you don't know anything about the victim [Rivera]. The defense put in today two misdemeanor convictions. You don't know anything about that. *When you look at [Rivera] in this photograph it's in the indignity of death, isn't it? Right? But what you see there is a human being*. If Christian Rivera used drugs, if he sold

drugs and he were arrested and convicted, he should go to jail for that. *But there's been nothing presented in this case that would justify the defendant taking that nine millimeter pistol and executing him.* Nothing.

"Now, ladies and gentlemen, *Christian Rivera can't speak to you today, and he can't tell you what he saw in the moments before the first bullet tore into his body. He can't tell you which bullet hit him first.* The only person that's testified in this case that Christian Rivera tried to rob someone was the defendant." (Emphasis added.)

The defendant also challenges this portion of the state's rebuttal argument: "Now, ladies and gentlemen, *when Christian Rivera went up the steps on that fatal night he was alone. He was all alone. The defendant had his crew behind him or his team. And in a few minutes*, ladies and gentlemen, *Christian Rivera won't be alone anymore, because you're going to get this case.* You're going to have the case in your hands and you're going to decide what the facts are. Justice dictates that you return a verdict of guilty on murder." (Emphasis added.)

[3] The state contends that the prosecutor's subsequent statement directing the jury to reach its verdict on the basis of the evidence and not out of sympathy for Rivera casts the prosecutor's statements in a different light so as to bring them within the scope of proper argument. We disagree. The state cannot always remove the taint of improper argument simply by thereafter reciting a statement acknowledging the jury's duty not to decide the case on the basis of improper considerations.

[4] The defendant challenges this portion of the state's rebuttal argument: "Now, ladies and gentlemen, like the legal shows that we talked about, there's a lot of animal dramas on TV, right? About a year ago there was this show about the creatures of the deep and they had talked about sharks, they talked about dolphins and all the different ways that animals protect themselves in the water. They had one, and it was very interesting, it was an octopus. *Do you know how the octopus protects itself in the water? It shoots out ink into the water. Do you know what happens when you shoot out the ink? The water gets muddy and the octopus swims away. That's what's being attempted here.* Defense counsel wants you to focus on the police. She wants me to say that the police aren't on trial. Evaluate the police officers' conduct. You should. Absolutely you should. But don't lose sight from the fact for one second that the defendant's on trial. And every moment that you spend evaluating other people's conduct is time that you're not spending evaluating the defendant's conduct, *and that's called a shotgun approach. You shoot it against the wall and you hope that something will stick."* (Emphasis added.)

[5] The octopus analogy has been the subject of due process claims in many other jurisdictions, with a split of authority as to whether it is per se improper. Several courts have suggested that it is improper but insufficient on its own to deprive a defendant of a fair trial. See *United States* v. *Matthews*, 240 F.3d 806, 819 (9th Cir. 2001) ("In this case, the [g]overnment walked—and may have overstepped—the line by insinuating that defense counsel was trying to hide the truth. Since [the defendant] did not object to this commentary at trial, however, we must examine whether the statements had an impact on [his] substantial rights. The statements made in this case are unworthy of a representative of our government, but under all the circumstances of this case, they are not plain error."), rev'd in part on other grounds, 278 F.3d 880 (9th Cir. 2002); *People* v. *Cummings*, 4 Cal. 4th 1233, 1302, 850 P.2d 1, 18 Cal. Rptr. 2d 796 (1993) (acknowledging improper implication could be drawn from expression, suggesting that taint from impropriety removed by curative instruction but ultimately concluding that claim was not properly preserved for review); *Settles* v. *United States*, 615 A.2d 1105, 1113–14 (D.C. 1992) (suggesting any impropriety did not deprive defendant of fair trial under all circumstances); *People* v. *McCann*, 348 Ill. App. 3d 328, 338–39, 809 N.E.2d 211 (2004) (suggesting that analogy was improper but did not rise to level of plain error to require new trial); *People* v. *Light*, 480 Mich. 1198, 748 N.W.2d 518 (2008) (The court stated in its order denying leave to appeal: "[W]e take this opportunity to emphasize that it is improper for a prosecutor to make a personal attack on defense counsel, suggesting to jurors in closing argument that counsel is intentionally trying to mislead them. Although such conduct may not require reversal in a given case, it is still improper and unbecoming of a representative of the state.").

Some courts have squarely stated that this analogy is improper; see, e.g., *People* v. *Townsend*, 136 Ill. App. 3d 385, 413–14, 483 N.E.2d 340 (1985); *People* v. *Crawford*, Docket No. 302648, 2012 WL 3139473, *6 (Mich. App. August 2, 2012), appeal denied, 493 Mich. 920, 823 N.W.2d 589 (2012); *Hanson*

v. *State*, 72 P.3d 40, 49 (Okla. Crim. App. 2003); whereas others have considered the analogy proper in the context of the arguments as a whole. See, e.g., *People* v. *Clark*, Docket No. 281460, 2010 WL 4137437, *2 (Mich. App. October 21, 2010) (not improper when viewed in context because rebuttal statement was responsive to certain statements in defense counsel's closing argument); *State* v. *Mousel*, 373 N.W.2d 359, 363 (Minn. App. 1985) (not improper in situation in which analogy directly connected to specific " 'distractions' " that defense raised); *State* v. *Munroe*, Docket No. E2008-00129-CCA-R3-CD, 2010 WL 2473309, *11 (Tenn. Crim. App. June 18, 2010) (construing remark contextually as argument that defense theory was not worthy of belief in light of evidence); *Davis* v. *State*, Docket No. 13-03-291-CR, 2004 WL 1584921, *2 (Tex. App. July 15, 2004) (concluding that analogy did not attack defense counsel personally but instead was used to explain evidence and respond to argument offered by defense). We note that the analysis in many of these jurisdictions appears to differ from ours in that they conflate the questions of whether a comment was improper and whether an improper comment deprived the defendant of a fair trial.

[6] In *State* v. *Salamon*, 287 Conn. 509, 559, 949 A.2d 1092 (2008), we concluded that, "[a]lthough the term 'smoke screen' is more problematic [than 'red herring'] because it may be viewed as connoting an intent to deceive; see [Webster's Third New International Dictionary] (defining 'smoke screen' as 'something designed to obscure, confuse, or mislead'); we cannot say that the use of that term, which was isolated, rises to the level of an impropriety." In retrospect, it appears that we conflated the questions of whether the statement was improper and whether the impropriety deprived the defendant of a fair trial. Under the latter, we consider the frequency of the impropriety as one factor. See *State* v. *Warholic*, 278 Conn. 354, 396, 897 A.2d 569 (2006); cf. *State* v. *Outing*, 298 Conn. 34, 85, 3 A.3d 1 (2010) (expressing disapproval of prosecutor's use of terms smoke screen or smoke and mirrors "even as an isolated reference"), cert. denied,      U.S.     , 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

[7] The defendant challenges the following comments during Ayala's direct examination by the prosecutor:

"Q. What made you want to bring this to the attention of the state's attorney's office or to law enforcement in general?

"A. Maybe it could help my case.

"Q. So that's what you hoped was going to happen?

"A. Yes, sir.

"Q. *Again, I'm going to tell you, because if you want to change your story, go ahead and change it, there's no promises to you. Okay? Period and end of story.* Now, do you understand that?

"A. Yes, sir.

"Q. *That's one thing to hope that something's going to happen, and it's another thing to be told or expected.* Did anybody give you any reason to expect something good is going to happen with all your charges?

"A. No, sir.

"Q. You understand that?

"A. Yes." (Emphasis added.)

The defendant also challenges the following statement in the prosecutor's closing argument: "Ayala hopes he gets something for testifying? Sure he does. Sure he does. But the point is the defendant admits that he had the conversation with [Ayala], right, so that's a check one right there. The second thing is the state's not promising anything to . . . Ayala and he made that clear to you, *and we make it clear to the jury*." (Emphasis added.)

[8] The prosecutor argued: "[H]old the state of Connecticut to our burden. Evaluate our witnesses. Look at the evidence in this case. Hold the state to it. But if you do that, and you do your duty as jurors, there's only one conclusion you can reach, not that it's manslaughter in the first degree or manslaughter in the second degree, but this is murder and that it was not justified."

[9] Only one of the cases brought to our attention by the defendant involved a statement deemed improper when the state had made a connection between the duty to convict and the state's satisfaction of its burden of proof. That case is distinguishable from the present case, however, in that the government did not argue that the jury would have a duty to convict *if* the jury found that the state had met its burden and did not argue that a contrary conclusion would justify acquittal. See *United States* v. *Mandelbaum*, 803 F.2d 42, 43 (1st Cir. 1986) (The court deemed the following statement improper: " 'I think, ladies and gentlemen, that when you finish examining all these materials, you will be able to find, I suggest to you, that

there is ample evidence there for you to find beyond any reasonable doubt that [the defendant] did in fact commit the acts that the government charges her with. And I would ask you, therefore, to do your duty and return a verdict of guilty.' "); see id., 44 ("[t]here should be no suggestion that a jury has a duty to decide one way or the other; such an appeal is designed to stir passion and can only distract a jury from its actual duty: impartiality").

[10] As we previously have explained, under *Singh*, it is not per se improper to argue that the jury must conclude that one side of conflicting accounts must be wrong. Although we conclude that it would be unwise in the present case to attempt to articulate a bright line rule as to when such argument would be improper, we urge prosecutors to avoid statements directly connecting these assessments to the defendant's conviction or acquittal.

[11] We note that the state did seek certification on this first issue, but we limited the grant of certification to the state's challenge to the *Singh* violation. At oral argument before this court, the state explained that it had conceded this impropriety in its brief to this court, despite its view that the use of these terms is not improper, on the assumption that our decision not to grant certification on this issue signaled our intention to leave the Appellate Court's conclusion undisturbed. We would remind the state that "[t]he exercise of discretionary jurisdiction, by way of certification, is premised on the understanding that a denial of discretionary review leaves the underlying judgment in place without an endorsement of its merits. [A] denial of certification does not necessarily indicate our approval either of the result reached . . . or of the opinion rendered . . . ." (Internal quotation marks omitted.) *Grieco* v. *Zoning Commission*, 226 Conn. 230, 233 n.5, 627 A.2d 432 (1993). As we explain in part I of this opinion, the state would have been free to raise this claim as an alternative ground for affirmance. We therefore conclude that, because this issue was not briefed by the parties and would not be dispositive in the present case in any event, it is inappropriate to consider the propriety of the Appellate Court's conclusion.

[12] The defendant contends that the Appellate Court improperly relied on this court's decision in *State* v. *Thompson*, supra, 266 Conn. 440, as setting a "standard" by which the severity of prosecutorial impropriety is measured. See *State* v. *Albino*, supra, 130 Conn. App. 779. We construe that court's statement—"employing the *Thompson* standard, as we must, we conclude that the improprieties were not severe"; id.; simply to mean that the court properly considered whether the severity of the conduct in the present case was greater than conduct that this court previously had deemed not to be severe. A comparative analysis is useful in these cases, but we agree with the defendant that the improprieties in each case must be considered in light of the case's unique facts and circumstances.

—————————————————